259 F.2d 476
 Michael STELLA, suing on his own behalf and on behalf of all
other stockholders of Kaiser-Frazer Corporation
similarly situated, Plaintiff-Appellant,
v.
GRAHAM-PAIGE MOTORS CORPORATION and Kaiser-Frazer
Corporation, Defendants-Appellees.
 No. 190, Docket 24655.
 United States Court of Appeals Second Circuit.
 Argued March 4, 1958.
Decided Sept. 26, 1958.
 
 Lewis M. Dabney, Jr., New York City (Murray C. Bernays, New York City, on the brief), for plaintiff-appellant.
 Wm. Francis Corson, New York City (Garey & Garey, Ambrose V. McCall, Sol Irving Sokolsky, New York City, on the brief), for defendants-appellees.
 Before LUMBARD, WATERMAN and MOORE, Circuit Judges.
 
 
 1
 MOORE Circuit Judge.
 
 
 2
 The plaintiff (appellant) brought this derivative action as a stockholder of Kaiser-Frazer Corporation (referred to as 'KF') to reclaim for KF from the defendant Graham-Paige Motors Corporation (refreed to as 'GP') profits allegedly received by GP on the sale of 155,000 shares of KF stock within six months after their purchase by GP. The action is based upon the theory that under section 16(b) of the Securities Exchange Act of 1934 (48 Stat. 896, 15 U.S.C.A. section 78p(b)), the seller (KF) may recover any profit made by the purchaser (GP), a so-called 'insider,' in the event the stock was sold after having been held less than six months. GP's position as an insider has been established upon a previous appeal (2 Cir., 1956, 232 F.2d 299, certiorari denied 352 U.S. 831, 77 S.Ct. 46, 1 L.Ed.2d 52).
 
 
 3
 Upon the first trial the district court found that plaintiff had failed to sustain his burden of proving that profits had been realized and, therefore, decided in favor of GP (132 F.Supp. 100). This court (232 F.2d 299), holding that GP and not plaintiff had the burden of proof of showing that the profits on the sale were less than the $434,787.86 reported by GP in its income tax return, remanded with directions that the trial court make specific findings as to whether GP had made any profits and, if so, to what extent. The parties submitted the case to the same trial court on the original record which the district court reconsidered to determine whether GP in fact had sustained the burden of proving that it had not profited. The trial court found that instead of a profit GP had actually suffered a loss of $671,150 on its sale of the 155,000 shares of KF stock (149 F.Supp. 390). Plaintiff again appeals, complaining primarily that the trial court did not follow the opinion of this court on the previous appeal.
 
 
 4
 The facts are set forth in such detail in the previous opinions that they need not be repeated except as necessary to clarify the points now presented.
 
 
 5
 In late 1945, after World War II, KF and GP were engaged in the manufacture of automobiles. They shared a plant at Willow Run, Michigan. KF was a new company in the field but GP had some 146 distributors and 3,564 dealers obtained as a result of substantial expenditures. The joint operation proved to be unsuccessful and the management of both companies sought a solution of their problems. Discussions ensued between the officers, accountants and counsel for the two companies and a plan was evolved whereby the tangible and intangible assets of GP were to be transferred to KF in exchange for the issuance to GP by KF of 750,000 shares of KF stock and an undertaking by KF to pay to GP an amount equal to the principal of, and interest on, $8,524,000 face amount of GP's 4% convertible debentures due April 1956. The assets transferred by GP to KF consisted of a substantial amount of cash and assets tangible and intangible. Because they proposed to issue stock for the acquisition, the number of shares to be given had to be fixed in relation to some dollar value. At the time of the negotiations the KF stock was selling at approximately $8 per share in the market. Market value, absent any manipulation or artificiality (and there is no proof of such a situation here), usually represents the collective judgment of the financial and investing community of the value of the property.
 
 
 6
 KF approached the valuation problem from the point of view of the net proceeds of a sale to the public of 750,000 shares of stock in the light of the then market price of $8 per share and concluded that not more than $6.50 a share or $4,875,000 would be realized from such a public offering. Accordingly, the KF directors decided that they would buy all of GP's automotive assets, accounts receivable, $3,000,000 in cash and $1,250,000 subject to adjustment in exchange for KF's undertaking to pay to GP an amount equal to GP's outstanding 4% debentures ($8,524,000), the issuance of 750,000 shares of KF's common stock and KF's assumption of GP's automobile business at Willow Run.
 
 
 7
 The transacion was consummated. Less than six months after GP had acquired the 750,000 KF shares it sold 155,000 of these shares for $6,75 a share. On its Federal income tax return GP reported a cost of $3.94 a share for the stock and a profit of $2,81 a share or a total profit of $434,787.86 on the 155,000 shares. It is this profit which plaintiff seeks to recover for KF.
 
 
 8
 Two principal questions must be resolved: (1) did GP actually realize a profit on the sale; and (2) having declared a profit on its income tax return and in its S.E.C. proxy statement, is GP estopped from asserting otherwise in this case.
 
 
 9
 In view of this court's opinion the trial court was under a duty to re-examine the facts to determine whether GP had met its burden of proof that it had not made an actual profit upon the stock sale.
 
 
 10
 Many factors enter into value. The weight to be given to these factors involves the business judgment of the bargaining parties. In the absence of fraud or self-interest, the judgments of corporate directors representing KF and GP are not lightly to be disregarded. At the threshold of the transaction the directors of KF had to determine the price to be paid for the GP assets. If KF, instead of issuing 750,000 shares of stock to GP, had paid $7,500,000 for the assets transferred because of the special and unique value which they had to KF, this dollar amount would have represented to KF and GP the value of the assets. A purchaser of scrap or a dealer in second-hand machinery might only have paid $500,000 for these assets as scrap metal or second-hand machinery and, not being an automobile manufacturer, paid nothing for the investment in name and dealer organization. But such a purchase offer under such circumstances would not be relevant. In fact, any assumption of a sale of this type would violate the fundamental concepts of proper valuation. The fair value of large industrial properties cannot be fixed by the estimated price which might be received on the auction block in liquidation. The best price would undoubtedly be offered by some company which had the greatest need for the property being sold. Only when such a purchaser were found would the seller obtain the optimum value. It is meaningless to talk in terms of a 'willing seller-willing buyer' rule upon which appellant seems to found his principal argument unless there be a realistic and common sense approach to the rule. Obviously no seller is going to become 'willing' until he finds the buyer who will pay the best price because of his belief that these particular assets will be peculiarly beneficial to him.
 
 
 11
 The fallacy of appellant's theory is well illustrated in his brief wherein he attacks appellees' witnesses because 'neither was testifying in terms of what a willing buyer dealing at arms length would pay for the intangibles' (p. 26). Naturally a willing buyer might willingly offer nothing for the intangibles. But would the seller be as willing to accept?
 
 
 12
 In the same unrealistic vein, appellant would calculate the value of GP's property on the hypothesis that it 'was unsaleable to an outside purchaser for any more than scrap value' and that a substantial part of the machinery 'would have only scrap value to a purchaser not interested in securing such parts' (Applt.'s Br., p. 25). Such assumptions are neither relevent nor helpful as guides to a correct valuation. GP was not driven to sell its machinery to junk dealers or to discard its car designs and its dealer organization built up at great expense. KF recognized that there was value in these and other intangibles and issued its stock accordingly.
 
 
 13
 Appellant, as a stockholder of KF is, in effect, challenging the judgment of his own officers and directors and is endeavoring to substitute his hindsight judgment for their business judgment exercised at a critical period in the corporate lives of both KF and GP. Nevertheless, he recognizes that 'The value of property which is to be fixed by a board of directors when the company issues stock for such property is the special value to the company' (Applt.'s Br., p. 28). Having asserted a generally sound principle, appellant can only avoid it by falling back on his underlying misconception that special value 'is no evidence of what a willing buyer would pay' or 'of the price which would be paid by the hypothetical willing buyer' (Applt.'s Br., pp. 28, 29). Again appellant completely ignores the fact that a 'willing buyer' cannot but unless there be a 'willing seller' to sell for a price which he regards as fair value of the assets sold.
 
 
 14
 The principal issue on this appeal is defined in issue number 6 in the Pre-trial order as follows:
 
 
 15
 'Was there any actual profit realized by Graham-Paige within the comprehension, intent, meaning and purview of Section 16(b) by the sale of 155,000 shares of Kaiser-Frazer stock?'
 
 
 16
 To determine 'actual' profit, 'actual' cost must be sought-- at least to the extent of ascertaining whether any profit resulted from the sale.
 
 
 17
 Where stock is acquired for property, tangible and intangible, the cost of the stock should be computed upon the value or worth of the assets delivered in exchange. The tangible assets are capable of fairly definite ascertainment. It is the intangible items which present the chief difficulty. That the latter were an important part of the transaction is clearly supported by the proof. The directors of KF prior to approving the delivery of 750,000 shares to GP had considered the fact that GP 'since September of 1945 had incurred a cost in excess of $8,000,000.00 in the development of the automobile business, building up a dealer and distributor organization and making the trade name 'Frazer' known to the public through a national advertising campaign,' and 'would derive the benefits from the 'going concern value' which had been built up by Graham-Paige Motors Corporation through the expenditure of this sum.' In addition 'Graham-Paige Motors Corporation had the right to use one-third of the capacity of the Willow Run Plant which right would be an extremely valuable one as soon as the production of automobiles was such as to enable the operators of the plant to make a profit.' (Bd. of Dir. Min., Dec. 3, 1946, Ex. A.)
 
 
 18
 There was also testimony that the GP dealer and distributor organization acquired by KF had cost GP some three million dollars to set up and that it was actually worth substantially more; that large sums had been expended by GP on national advertising of which KF received the benefit; that patent rights were of value; and that the 'going concern' value was worth many millions to KF.
 
 
 19
 The action taken by the KF directors in authorizing the issuance of the 750,000 shares is evidenced by their resolutions which were adopted after the Chairman pointed out that 'the book value of the automotive assets of Graham-Paige Motors Corporation plus the working capital in the sum of $1,250,000 and other funds which would be made available to the Corporation exceeded by approximately $2,100,000 the principal amount of the outstanding 4% Convertible Debentures of Graham-Paige Motors Corporation. Consequently it might be said that the Corporation was issuing 750,000 shares of its common stock in exchange for $2,100,000.00 and the intangible assets of Graham-Paige Motors Corporation' (Ex. A, p. 3).
 
 
 20
 The KF Board resolved 'That the fair value of the consideration to be received for said 750,000 shares of $1.00 par value capital stock of the Corporation upon the transfer of said automotive assets, and the payments and assignments set forth in the foregoing resolution, is the sum of $4,875,000.00' and 'That in the judgment of the Board of Directors of the Corporation the money and property to be received by the Corporation for said 750,000 shares of stock is a fair and adequate consideration therefor, and is of a value at least equal to the value of said stock' (Ex. A).
 
 
 21
 Having evaluated the automotive assets and other funds at $2,100,000 in excess of the $8,524,000 obligation assumed to meet GP's outstanding debentures, a value of at least $2,775,000 had to be attributed to intangible items upon the hypothesis that the $4,875,000 figure in the resolution was calculated upon an $8 per share market value on December 3, 1946 and an assumed net realization of only $6.50 a share. On February 10, 1947 when the exchange was finally made the market price was 9 5/8. Assuming a net of $8 a share, because of the increased market price and accepting approximately the same discount, the $4,875.000 figure would be $6,000,000.
 
 
 22
 Although the KF directors considered value from the viewpoint of the net figure which might be realized upon a public sale, it is by no means certain that this principle should apply to the determination of actual cost upon an exchange of assets. KF was not seeking to raise cash from the public by means of a stock offering. Comparable value was the test rather than net realized after underwriters' discounts and charges. Therefore, the directors of KF might well have been justified in fixing a value closer to the actual market value. Were this discount ignored, the value of the intangibles would be even higher. Had the directors been faced with a price determination on February 10, 1947, they might well have fixed a price substantially in excess of $6.50 a share. There is no reason to believe that they would have been unmindful of their duty as directors to issue KF stock at fair value and not at a discount of over 33% of market value. Even a slight increase in value attributed by the KF directors on December 3, 1946 is sufficient to eliminate any profit upon the subsequent sale by GP of the 155,000 shares here involved.
 
 
 23
 The trial court following the directions of this court carefully analyzed the evidence to determine whether GP had satisfied its burden of proof that no profit was realized. He found as a result of certain assumptions and calculations that the cost of the 750,000 shares to GP was $11.08 a share and that instead of a profit a loss of $4.33 a share was suffered.
 
 
 24
 In our opinion it is unnecessary for purposes of decision here to adopt any particular theory of accounting or to make any assumptions as to specific items. The only question for decision is whether GP has established that the property exchanged was fairly worth at least $6.75 a share.
 
 
 25
 The purpose of the statute under which appellant seeks to recover should not be completely overlooked in the welter of evaluation hypotheses. The theory of section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. section 78p(b) is clearly stated in the Act:
 
 
 26
 'For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. * * *'The primary objective was to prevent 'insiders' with advance information from engaging in short-swing speculation to their own advantage and to the disadvantage of outside stockholders.
 
 
 27
 Looking at the transaction objectively, KF made a commitment to sell 750,000 shares of its stock when the market was 8 and concluded the transaction on February 10, 1947 when the market price was 9 5/8. The KF directors believed that the money and property received was 'fair and adequate consideration therefor and is of a value at least equal to the value of said stock' (Ex. A). Just as the directors of KF were under a legal and moral duty to obtain full value for the KF stock issued so also was the management of GP under a similar duty. The respective positions of the two companies made them a most willing buyer and an equally willing seller. GP received stock selling at 9 5/8 and sold it for 6 3/4, a loss of 2 7/8. Appellant asks this court to accept the hypothesis that on the day GP acquired the stock it was only worth $3.94 as against a market of 9 5/8. There is no basis whatsoever for any such conclusion.
 
 
 28
 Upon all the proof presented including market value of the KF stock, the worth of the so-called intangible assets (although good dealer and distributor organizations would appear to be highly tangible) built up at considerable expense to GP and the assumption by KF of the obligation to pay an amount equal to the principal and interest on the GP debentures, we believe that GP has sustained its burden of proof.
 
 
 29
 There remains for consideration appellant's argument that GP by its own figures and published statements has estopped itself against using any other cost figure than $3.94 a share. The fact that GP placed this figure on its books and even paid a profits tax based upon the difference between $3.94 and $6.75 per share the sale price of the 155,000 shares was the supporting reason for this court's previous declaration that appellant had made a prima facie case, thus shifting the burden to GP (232 F.2d 299). Appellant points to representations in GP's proxy statement on the subject of assets to be transferred, a registration statement and prospectus in 1947, GP's 1947 annual report and its 1947 Federal income tax return, all as declaring a profit on the sale of the 155,000 shares.
 
 
 30
 This claim of estoppel was raised before Judge Dimock on the original hearing and rejected by him. Appellant then asserted this rejection as a ground for reversal on his first appeal to this court. Although this court did not explicitly rule on the point, by necessary implication it held against appellant because, had it considered appellant's position to be sound, it would have been compelled to have directed entry of judgment for him and would not have remanded for the purpose of forcing GP to prove the very facts which appellant claimed GP was estopped from asserting.
 
 
 31
 Apart from this fact, appellant's point examined independently is lacking in merit. Appellant concedes that these statements could not create a collateral estoppel and that they did not create an estoppel in pais, or equitable estoppel, because neither KF nor its shareholders relied upon the statements. Jelliffe v. Thaw, 2 Cir., 1933, 67 F.2d 880.
 
 
 32
 Appellant's theory is that the so-called doctrine of 'judicial estoppel' concerning inconsistent statements made in prior litigation likewise encompasses extrajudicial statements made to government agencies, here the S.E.C. and Internal Revenue Service. Appellant then argues that the important federal policies embodied in the tax and securities laws dictate such a conclusion.
 
 
 33
 The doctrine of judicial estoppel, as urged here, would extend estoppel beyond all reasonable bounds. In finding facts in a law suit the business of the court is to determine the truth or falsity of the controverted propositions of fact. Collateral estoppel, or estoppel by judgment, was not developed to render immutable all statements or pronouncements of litigants but to protect the parties from the expense, delay, and harassment attendant upon having to prove de novo a fact already established in an action between the same parties or their privies.
 
 
 34
 The case of Deitrick v. Greaney, 1940, 309 U.S. 190, 60 S.Ct. 480, 84 L.Ed. 694, relied upon by appellant, is not in point. There the maker of a promissory note who procured its illegal issuance was precluded from raising the defense of illegality. The court took pains to point out that estoppel was not the basis for striking the defense (309 U.S. 198, 60 S.Ct. 484).
 
 
 35
 Even if we were to accept-- which we do not-- the dicta that a party in a court proceeding could not assert a fact contrary to a prior assertion made before an administrative tribunal, appellant still could not prevail. In Lewis v. Atlas Corp., 3 Cir., 1946, 158 F.2d 599, 602, the prior inconsistent position was made to an S.E.C. examiner in the course of a hearing, i.e., a quasi-judicial proceeding. The statements here sought to be set up as estoppels were made in the regular course of business. The figures were reached as results of negotiations conducted by GP with the S.E.C. and the Revenue Service with the explicit realization by all concerned that the true cost of the shares was impossible to evaluate. Thus these opinions did not purport to be statements of demonstrable facts within the knowledge of GP, and were not made in any type of judicial proceeding. A party who is forced in the course of his business for practical reasons[1] to make an estimate or to venture a guess is not forever precluded from reversing his estimate.
 
 
 36
 Nor is it necessary to decide whether or not profits might have been made on the sale of the assets. That question is not before us. The sole issue is whether there was a profit on the sale of stock within the purview of section 16(b). We believe that GP has sustained the burden of proof that there was no such profit and accordingly affirm the judgment below.
 
 
 37
 Judgment affirmed.
 
 
 38
 WATERMAN, Circuit Judge, concurs in the result.
 
 
 
 [1]
 The trial court recognized that 'This willingness to pay tax on a profit attributable to the sale of stock seems inconsistent with Graham-Paige's present position' but found that a 'study of the surrounding factors reveals that this apparent inconsistency is unreal.' Thus, in computing profits on the sale of the 155,000 shares of stock for tax purposes it might have been improper in evaluating the stock to include as part of the value of the stock, i.e., as intangible assets, expenditures already deducted from past income