Harold C. BOOTH et al., Defendants,
Appellants,

v.

VARIAN ASSOCIATES, Plaintiff,
Appellee.

No. 6277.

United States Court of Appeals
First Circuit.

July 15, 1964.

Louis Loss, Cambridge, Mass., with whom C. Henry Glovsky and Glovsky & Glovsky, Beverly, Mass., were on brief, for appellants.

Frank W. Crocker, Boston, Mass., with whom Edward A. Benjamin and Ropes & Gray, Boston, Mass., were on brief, for appellee.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

HARTIGAN, Circuit Judge.

Plaintiff-appellee, Varian Associates, a California corporation, brought an action in the United States District Court for the District of Massachusetts under Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), to recover alleged "inside profits" made by defendants-appellants, Harold C. Booth and Henry J. McCarthy, both of Massachusetts, on the sale of certain shares of Varian stock. From the granting of the appellee's motion for summary judgment, entered December 12, 1963, appellants appeal.

The facts are not in dispute. In January, 1959 Varian acquired 80% of the outstanding shares of Bomac Laboratories, Inc., a Massachusetts corporation. Most of these shares were acquired from appellants, who remained owners of the remaining 20% of the Bomac stock. Shortly thereafter appellants became members of the board of directors of Varian.

On January 14, 1959 Varian and appellants entered into a contract entitled "Agreement For Exchange of Stock," amended on February 26, 1959, under which appellants agreed to sell to Varian their remaining shares of Bomac stock in return for that number of shares of Varian stock which, on the basis of the market quotations of the day before the closing, would equal in value $2,000,000 plus 20 per cent of the amount by which the retained earnings of Bomac at the end of the month preceding the closing exceeded the retained earnings on December 31, 1958. The closing date was to be July 2, 1962, subject to acceleration by Varian, or in certain limited circumstances by appellants. The closing was in fact accelerated by three days by Varian and the actual exchange of shares

took place on June 29, 1962. Since late in 1959 appellee's shares have been listed on the New York Stock Exchange.

Within less than six months after June 29, 1962 appellants sold some of their shares of Varian on the New York Stock Exchange at a profit over the June 29 market of $42,895 for appellant Booth and $12,309 for appellant McCarthy. These profits are recoverable under § 16 only if the sales of the stock took place within six months of the purchases.

The objectives sought to be accomplished by Congress in adopting Section 16(b) are clear from the statute which, in pertinent part, reads as follows:

> "(b) For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer * * * within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, * * *."

It was recognized that those covered by the statute might have information not accessible to a shareholder, actual or prospective, and would thus possess an unfair advantage in market dealings. Gratz v. Claughton, 187 F.2d 46 (2d Cir.), cert. denied, 341 U.S. 920, 71 S.Ct. 741, 95 L.Ed. 1353 (1951). The statute is remedial rather than penal, Adler v. Klawans, 267 F.2d 840 (2d Cir. 1959), and includes all profits realized by those assumed by the statute to have access to inside information whether or not an intention to profit from an unfair use of information can be shown. Smolowe v. Delendo Corporation, 136 F.2d 231, 148 A.L.R. 300 (2d Cir.), cert. denied, 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943). If, as directors of Varian, appellants negotiated a sale of Varian stock within six months of the date of purchase, they are liable to appellee for the profit resulting from such sale.

Section 3(a) (13) of the Act, 15 U.S.C. § 78c(a), states that "unless the context otherwise requires" the term "purchase" includes "any contract to buy, purchase or otherwise acquire." Appellants contend that the "purchase" of the Varian shares occurred at the time in 1959 when appellants entered into a mutually binding agreement to exchange their Bomac shares for those of appellee, although the number of Varian shares and their price on the date of exchange was then indeterminable due to the formula aspect of the agreement. Appellee contends that the "purchase" did not take place until June of 1962 when appellants received a specific number of shares at a specific price.

To further their respective arguments and due to a dearth of cases involving a contract containing terms similar to those here in issue, both sides have relied to a great extent upon cases concerned with the application of Section 16(b) to options, warrants, conversions and like transactions. E. g., Blau v. Ogsbury, 210 F.2d 426 (2d Cir. 1954) (options); Roberts v. Eaton, 212 F.2d 82 (2d Cir.), cert. denied, 348 U.S. 827, 75 S.Ct. 44, 99 L.Ed. 652 (1954) (reclassification); Park & Tilford v. Schulte, 160 F.2d 984 (2d Cir.), cert. denied, 332 U.S. 761, 68 S.Ct. 64, 92 L.Ed. 347 (1947) (conversion). While these cases contain language applicable to the present fact situation, it must be noted that they have presented special problems as to time and price of purchase and sale not easily fitted into the statutory framework nor directly relevant to the problem immediately before us.[1] Op-

1. See Comment, Put and Call Options Under Section 16 of the Securities Exchange Act, 69 Yale L.J. 868 (1960).

The option cases have raised the question of drawing a line at where the option, involving as it does a right to purchase *at a specific price*, has become in fact a "purchase."

**4**

tions, conversions and similar devices have lent themselves quite readily to the abuses uncovered in the Congressional investigation antedating the Act, and in order to give maximum support to the statute courts have attempted to include these transactions by characterizing them as purchases or sales. This has led to inconsistent results in the decisions, compare Park & Tilford v. Schulte, supra, with Ferraiolo v. Newman, 259 F. 2d 342 (6th Cir. 1958), cert. denied, 359 U.S. 927, 79 S.Ct. 606, 3 L.Ed.2d 629 (1959), and conflicting views among the commentators. Compare Cook and Feldman, Insider Trading Under the Securities Exchange Act, 66 Harv.L.Rev. 612 (1953), with Hardee, Stock Options and the "Insider Trading" provisions of the Securities Exchange Act, 65 Harv.L.Rev. 997 (1952). The practice of the courts in option cases of using one "purchase" date for the purpose of deciding whether profits are "short swing" and another "purchase" date for the purpose of measuring those profits led to the Commission's formulation of a rule mitigating the loss to the insider option holder found to have violated the statute. 17 C.F.R. § 240.16b–6. See Blau v. Hodgkinson, 100 F.Supp. 361 (S.D.N.Y.1951). In sum, we do not believe cases of the classes referred to, involving problems peculiar to their own types of transactions, are especially helpful in deciding the case before us.

■■ As there are no cases which we can turn to for substantial precedent, it is proper that we attempt to resolve the question involved in a manner that is practical and logical and will be most consonant with the statutory purpose. The question thus becomes one of balancing the respective advantages and disadvantages of each contended for "purchase" date and determining which one, if held to be the date of purchase, would be more likely to lend itself to the abuses the statute was designed to protect against. Adler v. Klawans, supra. See S.E.C. v. Ralston Purina Co., 346 U.S. 119, 125, 73 S.Ct. 981, 97 L.Ed. 1494 (1953). In addition, since we are dealing with a remedial measure, it is important that we consider the probability of bringing the insider to task for his violation of the statute. If one date lends itself to the possibility of abuse as much as the other but, because of the statute of limitations attached to Section 16(b), it would be difficult, if not impossible, to gain recovery against an insider who "purchased" on one of the contended for dates, then practical experience dictates that the purchase date within the recovery period should be selected as the one the statute was designed to include.

■ Although the agreement of January 1959 firmly committed both parties to an eventual exchange of shares, it by no means constituted a completed arrangement. Not only did it leave the purchase price unfixed, it provided that the price should be fixed at the closing market quotation on the day prior to the closing, nearly three and one-half years later, thus making the purchase under the contract as much as possible *like a market purchase at the time of the closing.* Besides sheltering appellants from the possible advantages or disadvantages of a fluctuating market, this would appear to have made speculation against the contract not only risky but, as appellee contends, virtually impossible.

To counter this observation and using January 1959 as the purchase date, appellants construct a hypothetical situation illustrating how it would have been possible for them to have violated the statute by means of a sale within six months of the January 1959 date. The illustration reflects more than the usual speculative risk, relying as it does on the presumed knowledge of the insiders in 1959 that upon receipt of their contracted for shares in 1962, the market will be low enough for them to make a profit on their 1959 sale which had been made in a rising market. Appellants, of course, recognize that a profit from the 1959 sale, if any, could not be calculated until the stock was acquired by them in 1962 and its purchase

price fixed. The basis of liability under § 16(b) being that the insider has, in fact, made a profit, it is likely that the two year statute of limitations would have expired before this essential fact was known and no recovery would have been possible.

On the other hand, the assumption of June 1962 as the date of "purchase" would be more consonant with the statute. For one thing, only on that date did the insiders know the amount of how much stock they were to receive and the price of each share, generally critical information for those whose potential profit from speculation is based upon an advantageous sale. Second, from an investment standpoint, appellants had no position in Varian during the three and one-half years interval between January 1959 and June 1962. Their investment position did not arise until the exchange ratio was fixed, no earlier than the close of the stock market on June 28, 1962. When they sold on the market later in 1962, their profits, in point of fact, were attributable to only *a short term investment* in appellee's stock. Third, a "purchase" made on June 28, 1962, followed by a sale within six months will be easily susceptible to enforcement.

Appellants concede the *possibility* of their having had inside information in determining when to sell their shares in the market in 1962, but contend that this is irrelevant and that there could be no cause of action therefor because the purchase occurred in 1959. At best this is circular reasoning since the date of the purchase is the point at issue.

The fact that Varian retained the right to accelerate the date of the final transaction does not help appellants. In one way it makes even more imprecise their concept that the purchase occurred in January 1959, for it rendered uncertain not only the number of shares that were allegedly then purchased, but the date of acquisition. Appellants' contention that their lack of control over the date diminished their opportunity to make insider profits, while possibly persuasive in one sense, overlooks the fact that they were at all material times insiders so far as Varian was concerned because of having two directorships. Section 16(a). Their argument that this was only "fanciful" control disregards their own quite proper concession that the act purports only to be a "crude rule of thumb."

An additional argument advanced by appellants is that, in any event, the transaction fell within the exemption provided by Section 16(b) of the Act on the ground that the Varian shares were "acquired in good faith in connection with a debt previously contracted." They contend that if the "purchase" did not take place in 1959, then at least there existed "a fixed and enforcible obligation to deliver a readily ascertainable number of dollars' worth of stock" and, therefore, the acquisition of these shares by appellants in 1962 was in connection with a "debt previously contracted" within the meaning of the statute. The district court gave scant credence to this argument and rightly so, for, as the court stated, to adopt appellants' point of view would "open the door to widespread evasion of the act, since any acquisition of stock could take the form of a contract in which the seller would owe a debt, that is, would have a firm obligation to deliver the stock at some future date, and the buyer would also owe a debt, that is, would have a corresponding obligation to pay for the stock at a future date in money or other property." 224 F.Supp. at 227.

Under the agreement it was clearly necessary for appellants to accept Varian stock in payment for the delivering up of their remaining interest in Bomac. This was not the situation present in Smolowe v. Delendo Corporation, supra, or in Rheem Manufacturing Company v. Rheem, 295 F.2d 473 (9th Cir. 1961) where the exemption was allowed because the stock in issue was delivered in payment of "independent and matured obligations." Heli-Coil Corporation v. Webster, 222 F.Supp. 831, 836 (D.N.J.1963). As the court recog-

**6**

nized in Rheem Manufacturing, supra, 295 F.2d at 476, the existence of a "debt previously contracted" is determined by "an obligation to pay a fixed sum certainly and at all events, existing prior to and apart from the settlement of the obligation by the transfer of stock * *."

Judgment will be entered affirming the judgment of the district court