**Harry LEWIS, Plaintiff,**

v.

**REALTY EQUITIES CORPORATION OF NEW YORK and First National Realty & Construction Corp., Defendants.**

No. 69 Civ. 5523.

United States District Court,
S. D. New York.

May 21, 1975.

Kaufman, Taylor, Kimmel & Miller, New York City, for plaintiff.

Raymond F. Gregory, New York City, for defendant Realty Equities Corp.

## OPINION

ROBERT L. CARTER, District Judge.

■ Plaintiff, a shareholder of First National Realty & Construction Corporation ("FNR"), brought this action pursuant to § 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), to recover short-swing profits which defendant Realty Equities Corporation ("REC") allegedly realized from a purchase and sale of FNR stock within a six-month period. The court granted plaintiff's motion for summary judgment on the issue of liability and gave the parties 30 days from the entry of the order to submit proof on the issues of damages and pre-judgment interest. 393 F.Supp. 829. However, the amount of damages could not be determined on summary judgment, and a short trial was held on the issue of damages alone. This opinion constitutes the findings of fact and conclusions of law required by Rule 52, F.R.Civ.P. The measure of damages is REC's profit, which is calculated by subtracting the purchase price of the FNR shares from the proceeds of sale.

### The Purchase Price

In its opinion on the issue of liability the court found the following facts concerning the purchase of the FNR shares to be undisputed. On March 9, 1967, REC entered into the "Second Exchange Agreement" with certain FNR shareholders. The agreement provided that, subject to certain conditions precedent, REC would exchange 51,000 REC shares for 306,000 shares of FNR. By September 18, 1968, the selling shareholders had performed all conditions precedent to REC's obligation under the Agreement. However, REC had *not* fulfilled all the conditions necessary to obligate the selling shareholders. On October 22, 1968, the closing occurred, and pursuant to the Agreement, REC trans-ferred a quantity of its own shares and received 302,900 FNR shares in exchange. On March 31, 1969, REC sold 300,000 shares of its FNR stock to Property Investment Company, Inc. ("Property Investment"). The date of sale was more than six months after September 18, 1968, but less than six months after the closing date of October 22, 1968.

■■ It was held that the purchase date was October 22, rather than September 18 as argued by defendant. As of September 18, the court said, the transaction was "arguably akin" to an option. According to the Second Circuit's decision in *Blau v. Ogsbury,* 210 F.2d 426 (2d Cir. 1954), the purchase occurs upon the *exercise* of the option, "when the alleged insider's rights and obligations [become] fixed * * *." 210 F.2d at 427. In the present case, even if REC's obligations became fixed on September 18, its rights did not become fixed until the closing on October 22, 1968.

The following additional facts concerning the purchase price of the FNR stock appear to be undisputed. At the closing on October 22, 1968, the consideration given by REC for 300,000 of the total of 302,900 FNR shares purchased that day was 50,483 shares of REC stock. In reports to shareholders, to the SEC and to the Internal Revenue Service and in response to an interrogatory in this case, REC stated that the purchase price of its 300,000 FNR shares was $435,646.-80. This figure was based on the market price of REC shares as of March 9, 1967, the date of the Agreement, rather than October 22, 1968, the date of the closing. On the date of the closing, the market price of 50,483 shares of REC stock, at $34.375 per share, was $1,735,353.

■ The "purchase price" of a security is ordinarily held to be the value of the consideration given for the security, rather than the value of the security itself. *Blau v. Lamb,* 242 F.Supp. 151 (S.D.N.Y.1965), *aff'd in part and rev'd in part,* 363 F.2d 507 (2d Cir. 1966), *cert. denied,* 385 U.S. 1002, 87 S.Ct. 707, 17

L.Ed.2d 542 (1967). REC argues that the purchase price of the FNR shares is equal to $1,735,353, the value of 50,483 shares of REC as of October 22, 1968.

■ Plaintiff contends, however, that REC is estopped by its statements to the SEC and the IRS and by its response to the interrogatory from denying that the value of the REC shares exchanged for FNR stock was $435,646.80, ·the market price of the REC shares as of March 9, 1967.

In *Stella v. Graham-Paige Motors Corp.*, 259 F.2d 476 (2d Cir. 1958), *cert. denied*, 359 U.S. 914, 79 S.Ct. 583, 3 L. Ed.2d 576 (1959), defendant had reported a large profit on a purchase and sale of stock in documents filed with the SEC and on its tax return. In holding that defendant was not estopped by such prior statements, the Court of Appeals emphasized that the statements had been made "in the regular course of business" for a purpose unrelated to the instant securities litigation. 259 F.2d at 482.

In the present case, I have no difficulty in holding, on the authority of *Stella v. Graham-Paige*, that REC is not estopped by its statements in documents filed with the SEC and the IRS.[1] These statements, like those in *Stella, supra*, were made in the regular course of business for a purpose unrelated to this litigation.

■ ■ Although this is not true of REC's response to plaintiff's interrogatory, I have decided that REC should not be estopped by that response. Testimony at trial established that use of the March 9, 1967, purchase price was proper according to the "first in first out"[2] accounting practice then in use by REC. That practice is not, however, binding on the court in calculating profits for pur-

poses of § 16(b). Moreover, in holding REC liable in my earlier decision, I found that its purchase of the 300,000 FNR shares occurred not on March 9, 1967, but on October 22, 1968, within six months of the date of sale, March 31, 1969. It would be inconsistent and unfair to hold now that the purchase price should be calculated as of March 9, 1967, a date considerably more than six months prior to the sale.[3] *See B. T. Babbitt, Inc. v. Lachner*, 332 F.2d 255, 258 (2d Cir. 1964); *Booth v. Varian Associates*, 334 F.2d 1 (1st Cir. 1964), *cert. denied*, 379 U.S. 961, 85 S.Ct. 651, 13 L.Ed.2d 556 (1965).

■ Furthermore, there is no real inconsistency between REC's prior statement and its present position. REC made its response to plaintiff's interrogatory before my decision on the motion for summary judgment, at a time when REC was still contesting liability and maintaining that the purchase had occurred more than six months prior to the sale. Since then, this court has decided the issue of the date of purchase against REC, and it is wholly proper to allow REC to conform its position as to the purchase price with this court's determination of the date of purchase.

■ In calculating the purchase price, the court is asked to follow the practice adopted by this circuit with respect to stock purchased pursuant to an option. In *B. T. Babbitt, Inc. v. Lachner, supra*, the Court of Appeals held that the exercise price should *not* be considered the purchase price of such stock. Rather, the purchase price for purposes of § 16 (b) was held to be equivalent to the fair market value of the underlying stock as of the date the option *first became exer-*

---

1. However, as stated below, REC's statements in official documents are evidence of REC's business judgment as to the purchase and sale prices at the time of the transaction.

2. The use of the March 9, 1967, price actually has reference to the purchase price of a separate lot of 420,000 FNR shares which

REC also contracted to purchase that day under the so-called "First Exchange Agreement." That transaction was closed on March 23, 1967, and no violation is claimed with respect thereto.

3. March 9, 1967, was more than two years before the date of sale, March 31, 1969.

*cisable.* 332 F.2d at 258; *Steinberg v. Sharpe,* 95 F.Supp. 32 (S.D.N.Y.1950), *aff'd* 190 F.2d 82 (2d Cir. 1951). The court's apparent concern was that there may be a long lapse of time between the grant of the option, when the exercise price is determined, and the six-month period during which the option is exercised and the stock sold. The Court wished to avoid imposing liability for the sometimes large increment in the value of the stock between the grant of the option and its exercise. The effect of the holding in *Babbitt* is to move the date as of which the purchase price is determined up toward the six-month period in which liability arises under § 16(b).[4]

If the rule with respect to options is applied to this case, the value of the REC shares should be computed as of October 22, 1968. REC's conditional right or "option" to purchase did not become "exercisable" on March 9, 1967, or even on September 18, 1968, since REC never performed the conditions precedent to the selling shareholders' obligation. REC's right to purchase did not become exercisable until the closing on October 22, 1968, when the selling shareholders permitted REC to exercise it.

It has been held that the option cases are "not directly relevant" to a case of this sort which involves nothing more than a lapse of time between the making of an executory contract and defendant's purchase. *Booth v. Varian Associates, supra,* 334 F.2d at 3. However, I think that the reasons for choosing a date within the six-month period for purposes of calculating the purchase price are even stronger in this case than in an option case. In the case of an option, the concern is that by the date of exercise,[5] the value of *the underlying stock*

may be substantially higher than the exercise price, which is based on the price of the stock as of an earlier date. The use of the relatively low exercise price as the price of purchase would result in a large profit. It is to be noted, however, that this measure of profit would, in fact, be equal to the actual difference between the price paid and the consideration received within a six-month period. By contrast, in the instant case, the value of the *consideration actually paid,* not merely the value of the stock which defendant purchased, rose substantially between March 9, 1967, and the closing date. If the purchase price were calculated as of the earlier date, the measure of profit would not be an accurate statement of the actual difference between the value of the consideration paid and the proceeds of sale received within the six-month period. It would be substantially greater.

For the foregoing reasons, I accept defendant REC's contention that the purchase price of the FNR stock was equal to $1,735,353, the value of 50,483 shares of REC stock as of the closing date.

*The Sale Proceeds*

In its earlier opinion, the court found the following facts concerning the sale of the FNR shares. On March 31, 1969, REC exchanged 300,000 shares of FNR stock for four unsecured, non-negotiable, non-interest bearing notes of Property Investment in the face amount of $3,-450,000.

The highest trading price of *registered* FNR stock on the American Stock Exchange on March 31, 1969, was $11.50 per share. Therefore, absent any factors that might reduce the market price of

---

4. Rule 16b–6, 17 C.F.R. 240.16b–6, which applies to certain cases involving options and other similar rights, was also designed to mitigate the severe result of using one purchase date for purposes of determining liability and another for calculating the purchase price. Booth v. Varian Associates, *supra,* 334 F.2d at 4. Rule 16b–6 limits recoverable profits by providing that in cases to which it applies, the purchase price shall be deemed to be no less than the lowest price of the security within six months before or six months after the sale.

5. The date of exercise is the purchase date for purposes of § 16(b). Blau v. Ogsbury, *supra,* 210 F.2d at 427.

a large *block* of shares, the market price of 300,000 *registered* shares was $3,450,000.

In its financial statements, REC reported a profit of $2,528,038.20. REC imputed interest of $475,065, and stated in financial reports that the net consideration received for the FNR stock was $2,974,935. From this figure, REC subtracted the reported purchase price of $435,646.80 and sales expenses of $11,250 to obtain a profit of $2,528,038.20.

In its financial statement for the year ending March 31, 1970, REC made provisions for a loss of $2 million based on a decline in the market value of Property Investment's holdings of FNR stock. The earlier opinion in this case found that in September, 1970, Property Investment sold the FNR stock to two individuals. At the time of that sale, REC accepted the individuals' note in lieu of the Property Investment notes. The face amount of this note was $3 million.

This court also found that in October, 1971, the two individuals sold the FNR stock to Unity Industries, Inc. ("Unity"), and that REC accepted Unity debentures in an unspecified amount in lieu of the individuals' note. In December, 1972, in settlement of all obligations owed to REC by Unity, REC agreed to accept all of the outstanding shares of Unity. REC therefore in effect reacquired the FNR stock without ever receiving cash for it.

At the trial, Mr. Irwin Trinkoff, certified public accountant for REC, testified that he had certified the statement in REC's 1969 annual report that the Property Investment notes were worth $2,974,935.[6] Trinkoff testified at the trial that it was indeed his conclusion, based on all the factors known to him in 1969, that the Property Investment notes were worth $2,974,935. Among the factors he considered were the following: Property Investment was the wholly owned subsidiary of Banker's Life Insurance Co. of Chicago.[7] Several banks accepted the Property Investment notes as collateral for loans to REC of approximately $1,500,000. In addition to the REC stock, Property Investment owned real estate in Arizona which was appraised at $1 million in 1959. According to a memorandum dated July 7, 1969, from the president of REC to Trinkoff, the real estate had been valued at about $3 million in 1969 by one Feil, a principal of Property Investment. Trinkoff relied on both appraisals in conjunction with the other factors in determining the value of the Property Investment notes. Trinkoff valued the 300,000 shares of FNR stock at $9.50 per share.

■■■ Plaintiff in a § 16(b) action bears the burden of making a prima facie showing of the maximum profit made by the defendant on the short-swing sale. The burden then shifts to defendant to prove the extent to which the actual profit was less than this maximum. *Lewis v. Nadaline; Fotocrome, Inc.*, CCH Fed.Sec.L.Rep. ¶ 94,587 (S.D.N.Y.1974).

■■■ Plaintiff in this case has sustained his threshold burden, and has established prima facie that the Property Investment notes were worth $2,974,935 and that REC's profit was $1,228,332. Plaintiff's principal showing in this regard is that the directors of REC and its accountant made a determination shortly after the date of the sale that the actual value of the notes was $2,974,935. This judgment is reflected in REC's annual statement, official documents, the interrogatory referred to above, and Trinkoff's testimony. In assessing this evidence, I am inclined to adhere to the general rule that a court should not lightly disregard the business

---

6. Mr. Trinkoff testified that although the face value of the notes was $3,450,000 he determined the actual value to be $2,974,935. The balance of $475,065 was imputed to interest.

7. Although REC had no recourse against the parent company on Property Investment's notes, Trinkoff did take into consideration the relationship between Property Investment and Banker's Life in valuing the notes.

judgment of the parties to a transaction. *See Stella v. Graham-Paige Motors Corp.,* *supra,* 259 F.2d at 478–79. Accordingly, I have decided to accept the contemporaneous judgment of REC's directors and accountant that the value of the notes was $2,974,935.[8]

 Moreover, Trinkoff's conclusion as to the value of the notes was amply supported by the factors he considered. As noted, these included the following facts: that Property Investment was the wholly-owned subsidiary of Banker's Life Insurance Co. of Chicago; that lending banks accepted the notes as collateral for substantial loans; that Property Investment held real estate variously appraised at $1 million to $3 million; and that Property Investment owned the FNR stock which Trinkoff valued at $9.50 per share or $2,850,000 for 300,000 shares.

 It may be significant that although Property Investment's notes were technically non-negotiable, REC was able to obtain, in substitution for them, the note of two individuals in the face amount of $3 million. There is no indication in the testimony or other evidence that this transaction was not at arm's length, and it may be of some probative value in establishing the value of the Property Investment notes. Subsequent similar transactions enabled REC ultimately to acquire all the stock of Unity whose assets included the FNR shares.

By way of showing that its actual profits were less than the maximum shown by plaintiff, REC relies on the analysis of Mr. Colman Abbe, a certified public accountant and securities analyst. Before making his initial affidavit, Abbe was informed by REC that after the sale, Property Investment had "substantially no assets" other than the FNR stock. Relying on this information, Abbe expressed the opinion that "the value of the notes can be determined solely by looking to the value of the 300,000 shares of FNR stock, and * * the fair market value of the stock on March 31, 1969 was $690,000 * * *," or 20% of the value of registered, publicly traded shares.

Having focused attention on the value of the FNR stock, Abbe enumerated ten factors which he believed justified an 80% discount from the price of registered shares. He testified that only about 950,000 FNR shares of a total of 2,230,818 shares were in the hands of the public,[9] and that a sale of a block of 300,000 shares would depress the price severely. According to Abbe, it would be particularly difficult to sell the 300,000 shares since the daily trading volume was only about 5,000 shares. Abbe also attributed part of the discount to the fact that the shares were unregistered and carried no registration rights. Abbe testified that in view of the small "public float", mere disclosure of the fact that a block of 300,000 shares was about to be registered would cause a sharp decline in the market price of FNR shares. In reaching his conclusion that the FNR shares should be discounted by 80%, Abbe also relied on the absence of institutional holdings of FNR stock, FNR's poor financial condition, and his belief that the 300,000 shares did not carry control.[10]

8. As stated above in respect to the purchase price, I do not hold that REC is estopped by its statements in official documents. However, I do believe that such statements are persuasive contemporaneous evidence of the business judgment of REC's directors.

I could not accept the statement of the purchase price in REC's 1969 financials because it was inconsistent with my decision on the issue of liability. This is not true of REC's statement of the sales price.

9. The balance were in the hands of insiders, including REC which held 400,000 shares after the sale.

10. Apropos of the latter point, Trinkoff testified that in valuing the FNR stock for purposes of his audit of REC, he had concluded that a holder of 300,000 shares might, by voting with another substantial shareholder, exercise control of FNR. Trinkoff had also been of the view that ownership of the 300,000 share block might entitle the holder to a place on the FNR board.

▮ However persuasive one may find Abbe's testimony as to the reasons for discounting the *FNR shares,* I cannot accept his conclusion that the Property Investment notes were worth no more than the discounted price of the FNR stock. Abbe testified on cross-examination that at the time he formed his opinion, he was not informed of at least three material facts about Property Investment. He did not know that Property Investment owned real estate appraised at $1 million to $3 million. He acknowledged on cross-examination that knowledge of this fact would have affected his assessment of Property Investment's ability to repay its obligations, and hence his valuation of the notes. Abbe did not take into consideration the fact that banks had made substantial loans on the security of the notes. Nor was he informed until a week or two before trial (long after he formed his opinion) that Property Investment was the wholly owned subsidiary of a substantial insurance company. Since Abbe's knowledge of the facts was incomplete at best, I cannot accept his conclusions.

▮ In its memorandum, REC also contends that I may consider Abbe's valuation of the FNR stock in determining the value of the Property Investment notes on the principle of *B. T. Babbitt, Inc v. Lachner, supra.* In *Babbitt,* the court held that where the consideration received for a sale of stock is without readily ascertainable market value, the value of the stock sold is some evidence of the value of the consideration received. *See Lewis v. Nadaline; Fotocrome, Inc., supra,* CCH Fed.Sec.L.Rep. ¶ 94,587 at 96,056; *Marquette Cement Mfg. Co. v. Andreas,* 239 F.Supp. 962, 968 (S.D.N.Y.1965). However, I have concluded that the value of the Property Investment notes can be ascertained on the basis of the contemporaneous judgment of REC's directors and the testimony of Trinkoff, the accountant. Accordingly, there is no reason to invoke the *Babbitt* principle.

In summary, I conclude that the value of Property Investment's notes, excluding imputed interest,[11] was $2,974,935. According to defendant's response to plaintiff's interrogatory, the cost of sale, $11,250, should be added to the purchase price in computing the cost to REC of the shares. Accordingly, REC's profit was $1,228,332, calculated as follows:

| | | |
|---|---:|---:|
| Sale Price | | $2,974.935 |
| Less: Purchase Price | $1,735,353 | |
| Cost of Sale | 11,250 | 1,746,603 |
| Profit | | $1,228,332 |

### Pre-judgment Interest

Defendant REC argues that plaintiff should be denied pre-judgment interest on two grounds.

▮ First, defendant contends that its violation was at most inadvertent. This court has held that the purpose of assessing interest, to give full deterrent effect to § 16(b), is not served by imposing liability for interest where the violation is not wilful. Accordingly, pre-judgment interest may be denied in such cases. *Volk v. Zlotoff,* 318 F. Supp. 864, 867 (S.D.N.Y.1970); *Marquette Cement Manufacturing Co. v. Andreas, supra,* 239 F.Supp. at 968. The bare allegation of inadvertence in this case does not, however, justify relieving the defendant from liability for pre-judgment interest.

▮ Second, REC directs my attention to what it characterizes as inordinate delay in the prosecution of this litigation. The action was commenced on December 16, 1969, and defendant answered on March 9, 1970. After some discovery in 1970, plaintiff waited until September 14, 1972, before conducting additional discovery. It was not until

---

11. In contending that this court should accept REC's statement of its profit in its answer to interrogatories, plaintiff apparently does not dispute the exclusion of imputed interest in computing the sales price.

July 16, 1973, that plaintiff moved for summary judgment. Three and one-half years elapsed between the filing of the complaint and the summary judgment motion.

This court has held that an inordinate delay which is unexcused may be ground for denial of interest. *Blau v. Lamb, supra,* 242 F.Supp. at 161. In this case there is no indication in the record that REC was responsible for the delay of three and one-half years, and plaintiff has offered no excuse therefor. Accordingly, I find that plaintiff is not entitled to pre-judgment interest.

In conclusion, plaintiff is entitled to recover on behalf of defendant First National Realty & Construction Corp. $1,228,332 from defendant Realty Equities Corp. The parties are given 30 days to submit a judgment for this amount. The judgment should also provide for costs and reasonable attorneys' fees to be awarded to plaintiff from the sum recovered on behalf of First National Realty & Construction Corp. *See Smolowe v. Delendo Corp.,* 136 F.2d 231 (2d Cir.), *cert. denied,* 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943).

Settle order.