**Harry LEWIS, Plaintiff,**

v.

**REALTY EQUITIES CORPORATION OF NEW YORK and First National Realty & Construction Corp., Defendants.**

No. 69 Civ. 5523.

United States District Court, S. D. New York.

March 25, 1974.

Louis Kipnis, New York City, for plaintiff.

Shea, Gould, Climenko & Kramer, New York City, for defendants.

## MEMORANDUM OPINION

ROBERT L. CARTER, District Judge.

Harry Lewis, a stockholder in First National Realty & Construction Corp. ("FNR") brought this action on behalf of and for the benefit of the corporation to recover short-swing profits which defendant Realty Equities Corporation ("REC" or "defendant") allegedly realized by purchasing and selling FNR stock within a six-month period in violation of Section 16(b) of the Securities Exchange Act of 1934 ("§ 16(b)"), 15 U.S.C. § 78p(b).[1] Plaintiff now moves for summary judgment.

The following facts are essentially undisputed. Plaintiff is and has been the owner of FNR common stock continuously since prior to 1967. At all times pertinent to this lawsuit, the common stock of FNR was listed and traded on the American Stock Exchange, and transactions in that stock were within the purview of § 16(b). Prior to and on October 22, 1968, REC was the beneficial owner of more than ten percent of FNR's outstanding common stock, and was thus an "insider" subject to the strictures of § 16(b). On March 9, 1967, REC entered into an agreement (the "Second Exchange Agreement") with certain FNR stockholders which contemplated the acquisition of some 306,000 shares of FNR common stock. REC did in fact "purchase" 302,900 of these shares and received that stock on October 22, 1968. On March 31, 1969, REC exchanged 300,000 shares of FNR common stock for unsecured, non-negotiable, non-interest bearing bonds of Property Investment Company, Inc. ("Property Investment"). As a result of this exchange, REC reported a profit in the amount of $2,528,038.20.

Plaintiff urges that REC's October 22, 1968 receipt of 302,900 shares of FNR constituted a "purchase" within the contemplation of § 16(b), and that its disposition of 300,000 shares on March 31, 1969 constituted a "sale" from which profit was realized. Defendant, on the other hand, insists that the stock was "purchased" not later than

1. § 16(b) provides, in pertinent part:

"For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer . . . within any period of less than six months . . . shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months . . . .."

September 18, 1968, that the March 31 exchange did not constitute a "sale" within the contemplation of § 16(b), and that no profit was "realized."

Defendant characterizes this divergence of opinion as creating a genuine issue as to material facts. I disagree. The dispute over the purchase date is, in truth, a question of law in respect of what constitutes a § 16(b) "purchase." Similarly, what constitutes a "sale" and a "realization" of profit are questions of law. Thus, the instant case is appropriately postured for summary judgment determination.

### The Purchase Date

On March 9, 1967, REC entered into two exchange agreements with certain FNR stockholders. The first such agreement, which provided for the exchange of 420,000 shares of FNR for 70,000 shares of REC and in respect of which no § 16(b) violation has been claimed, was closed on March 23, 1967. The Second Exchange Agreement provided for the exchange of an additional 306,000 shares of FNR for an additional 51,000 shares of REC, and was not consummated until October 22, 1968. However, by September 18, 1968, all the conditions precedent to REC's obligation under the Agreement had been performed.

In choosing between the two contended for "purchase" dates, September 18, 1968 and October 22, 1968, certain guidelines are clear. Paramount among them is that "the purpose of the statute is remedial, rather than penal, and . . . it must be strictly construed in favor of the corporation and against any person who makes profit dealing in the corporation stock." Adler v. Klawans, 267 F.2d 840 (2d Cir. 1959). Although courts may inquire into a transaction's potential for speculative abuse where "alternative constructions of the terms of § 16(b) are possible," Reliance Electric Co. v. Emerson Electric Co., 404 U.S. 418, 424, 92 S.Ct. 596, 600, 30 L.Ed.2d 575 (1972), "as applied to 'purchases' and 'sales' as those terms are ordinarily understood in the law, the Congress allowed no loophole by which the insider could avoid the impact of the statute." Morales v. Arlen Realty & Development Corp., 352 F.Supp. 941, 944 (S.D.N.Y.1973).

It is true that the term "purchase" is defined in § 3 of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(13), to include "any contract to buy, purchase, or otherwise acquire," and where a "binding" contract to purchase exists, the contract date becomes a purchase date. Blau v. Ogsbury, 210 F. 2d 426 (2nd Cir. 1954). However, the instant case does not present such a situation. In Blau v. Ogsbury, the court held that a purchase occurred when the plaintiff *exercised* a stock option because on that date he had a fixed obligation to pay a certain price for a certain number of shares, and the issuer had an equally fixed obligation to deliver the shares. "The time when the alleged insider's rights and obligations [become] fixed [is] controlling in the application of the statute." *Id.*, at 427. In contrast, in the case at bar even if plaintiff's "obligations" became fixed on September 18, its "rights" did not. Even if FNR had performed all conditions precedent under the Second Purchase Agreement so as to obligate defendant should FNR decide to close the purchase, REC had not on September 18 fully performed its preconditions so as to obligate FNR.[2]

Although the transaction as it existed on September 18 was arguably akin to an option, *cf.* Silverman v. Landa, 306 F.2d 422, 424 (2nd Cir. 1962), the optionee was FNR which did not "exercise" its option until October 22, 1968. Thus, whether one views the transaction at issue as an executed ac-

---

2. ¶ 4B of the Second Exchange Agreement lists three conditions precedent to the obligations of the FNR selling stockholders, among them that the sellers receive an opinion of REC's counsel regarding certain matters set forth in the Agreement. REC admits in its sworn answers to interrogatories that no such opinion was delivered.

quisition consummated by payment and possession, or as an option which becomes a purchase for § 16(b) purposes upon its exercise, October 22, 1968, is the purchase date. This conclusion is supported, indeed independently mandated, by the fact that "[t]he courts, particularly in our circuit, have consistently interpreted section 16(b) in 'the broadest possible' terms in order not to defeat its avowed objective, resolving all doubts and ambiguities against insiders." Blau v. Oppenheim, 250 F.Supp. 881, 884, 885 (S.D.N.Y.1966).[3]

### The Sale

■ Defendant contends that no "sale" occurred on March 31, 1969, when it exchanged 300,000 shares of FNR for four notes of Property Investment in the face amount of $3,450,000. Observing that the notes were non-negotiable, unsecured, and non-interest bearing, and that the FNR stock became the principal asset of Property Investment, REC invokes the "economic equivalency" test enunciated in Blau v. Lamb, 363 F.2d 507 (2nd Cir.), cert. denied, 385 U.S. 1002, 87 S.Ct. 707, 17 L.Ed.2d 542 (1966).

Unhappily for the defendant, whatever life that argument might otherwise have had was snuffed out in Newmark v. RKO General, Inc., 425 F.2d 348, 354 (2d Cir.), cert. denied, 400 U.S. 854, 91 S.Ct. 64, 27 L.Ed.2d 91 (1970), where the court held that "[t]he doctrine of economic equivalence is applicable only to exchanges involving the securities of a single issuer; we stated clearly [in Blau v. Lamb] that 'sales or purchases by an insider of his issuer's securities for cash, the securities of a different company, or other property are within the reach of Section 16(b) . . .'" The notes of Property Investment were unquestionably "the securities of a different company, or other property." Had the value of the FNR stock risen, the face value of the notes held by REC

would have remained the same. Moreover, the fact that the FNR stock was reportedly Property Investment's principal asset is hardly compelling, inasmuch as Property Investment could have sold the stock and invested in another asset.

### Realization of Profit

In September, 1970, Property Investment sold the FNR stock it had received from REC to two individuals, and REC took their note in lieu of Property Investment's notes. In October, 1971, the two individuals sold the FNR stock to Unity Industries, Inc. ("Unity") and REC accepted Unity debentures in lieu of the individuals' note. In December, 1972, in settlement of various obligations owed to REC by Unity, Unity's shareholders transferred all of the outstanding Unity stock to REC. Thus, REC effectively reacquired the FNR stock without ever receiving cash for it.

Relying on Heli-Coil Corp. v. Webster, 352 F.2d 156 (3d Cir. 1965), REC maintains that it never "realized" a profit from the exchange of FNR stock for the notes of Property Investment because the notes were never paid, and because REC reacquired the stock. Heli-Coil, however, was expressly rejected by this circuit in Newmark v. RKO General, Inc., supra, where the court said:

"Alternatively, RKO urges us to decide that even if the exchange was a sale, it failed to realize any profit on the transaction, and, accordingly, plaintiff was entitled to no recovery. This argument rests almost entirely on the decision in Heli-Coil Corp. v. Webster, 352 F.2d 156 (3d Cir. 1965), which held there were no profits realized in a conversion of securities, the rationale being that realization would occur only when the securities received in the conversion were sold for cash. The purpose of the statute, it seems to us, is quite clearly inconsistent with this narrow interpretation of 'profits realized.' . . . Whether,

---

3. Nor does Kern Cty Land Co. v. Occidental Petroleum Corp., 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973) suggest that a less resolute standard be applied where, as here, the transaction is neither "unorthodox" nor "borderline."

upon divestment, the insider receives cash or property should be immaterial; if the statute is to achieve its end what is significant is that he has attempted to turn a short swing in the price of his issuer's securities to his own personal advantage. . . . The receipt of . . . shares was a sufficient realization of profit to place the transaction within the scope of section 16(b). (citations omitted)" *Id.*, at 355 of 425 F.2d.

Defendant urges, despite *Newmark*, that the "reasoning" of *Heli-Coil* should apply where non-negotiable notes rather than marketable securities are received, and that no realization occurs until and unless the notes are paid. Assuming, contrary to the force and logic of *Newmark* that this proposition has merit, it is nevertheless inapplicable here. The Property Investment notes were *negotiable* in the sense that REC was able to receive in lieu thereof the note of two individuals, the debentures of a corporation, and ultimately the stock of that corporation.

 The fact that REC reported the exchange of FNR stock as a sale of property on the installment basis so as to avoid reporting income or paying taxes until it received cash for the notes, is not a controlling factor in determining § 16(b) liability, Blau v. Mission Corp., 212 F.2d 77, 80 (2d Cir. 1954), nor is defendant particularly helped by the fact that a year after the exchange it wrote off as a loss $2,000,000 of the $2,528,038.20 it had previously reported as profit.

Based on all of the foregoing, I find that REC purchased 302,900 shares of FNR common stock on October 18, 1968, and that within six months, on March 31, 1969, REC sold 300,000 shares of FNR common stock at a profit. Accordingly, plaintiff's motion for summary judgment is granted on the issue of liability.

*Damages*

Although it is undisputed that the Property Investment notes which REC received on March 31, 1969 were valued at $3,450,000, and that as a result of the March 31 exchange REC reported a profit of $2,528,038.20, defendant did not in its opposition papers squarely address the question of damages, nor indicate whether it thinks that an award of pre-judgment interest would be inequitable. Accordingly, the parties are given 30 days after the entry of this order to submit proofs going to the question of damages.

So ordered.