Simon L. PRAGER, a shareholder of Gable Industries, Inc., on behalf and in the name of Gable Industries, Inc., Plaintiff,

v.

Joseph J. SYLVESTRI, Defendant.

No. 75 Civ. 4829 (RLC).

United States District Court,
S. D. New York.

April 18, 1978.

Lans, Feinberg & Cohen, New York City, for plaintiff; Asher B. Lans, Stephen J. Feinberg, New York City, Edgar J. Royce, Oyster Bay, of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendant; Jay H. Topkis, Martin Flumenbaum, David S. Elkind, New York City, of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

Plaintiff alleges a violation of § 16(b) of the 1934 Securities Exchange Act, 15 U.S.C. § 78p(b). This section, aimed at curbing certain forms of corporate insider abuse of non-public information, requires that insiders disgorge to the corporation any profits realized within a period of six months on any purchase and sale of the corporation's stock.[1] Before the court are cross motions for summary judgment. Since I conclude

---

1. In pertinent part, the statute provides:

 "For the purpose of preventing the unfair use of information which may have been obtained by [an owner of more than 10% of the shares of a corporation], director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale . . . of any equity security of such issuer . . . within any period of less than six months . . . shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security pur-
 chased . . . for a period exceeding six months. Suit to recover such profit may be instituted . . . by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter . . . . This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or sale and purchase, of the security involved . . . ."

that defendant's sale of Gable stock occurred more than six months after his last purchase, no § 16(b) liability arises from these transactions. Consequently, summary judgment for defendant is granted.[2]

*Facts*

■ In 1972, the defendant was the sole owner and chief executive officer of Tibbetts Water & Waste, Inc. ("Tibbetts"). In April of 1972, the defendant, Tibbetts, Gable Industries, Inc. ("Gable") and a Gable subsidiary all entered into an Agreement and Plan of Merger ("Agreement") whereby the Gable subsidiary would be merged into Tibbetts, which would then continue to operate as a subsidiary of Gable. In essence, the merger Agreement was a sale by defendant of Tibbetts to Gable, in exchange for stock in Gable.[3] On the effective date of the merger, defendant's stock in Tibbetts would be converted into 218,330 shares of Gable, plus the right to receive additional shares from time to time, depending on the earnings of Tibbetts in the next four fiscal years. Generally, the plan provided that if Tibbetts' earnings in each of those years exceeded specified sums, defendant would receive Gable stock equal in value to a multiple of those "excess" earnings, using the average price of the stock during the relevant fiscal year as the basis for calculating the number of shares to be issued. However, the total number of shares that could be received over the life of this "earn-out" provision could under no circumstances exceed 300,000.[4] Entitlement to these earn-out shares was dependent solely on the future earnings of Tibbetts and in no way conditioned upon any act by the defendant.

The merger was closed on June 22, 1972, and defendant received the initial 218,330 shares. During the next few years, Tibbetts did well, and defendant received large blocks of shares under the earn-out arrangement, so that by April, 1974, he owned more than 10% of the shares of Gable, and thus became a § 16(b) beneficial owner. At the end of 1974, the earn-out arrangement still had two more years to run. By that time, however, defendant had already received enough earn-out shares so that, given the ceiling in the Agreement, he could receive a total of no more than another 105,362 shares, whatever the earnings of Tibbetts might be.

On February 28, 1975, Gable's fiscal year ended, and the computations on that year's earn-out could begin. On July 10, defendant received stock certificates for 105,362 shares, the maximum allowable. Some 6 weeks later, on August 19, defendant sold his entire holdings in Gable, which then totalled 407,350 shares, to The Flintkote Company for $15 a share, about double the market price of Gable on that date. Flintkote apparently paid this premium to defendant because it was attempting to gain control of Gable.

It is undisputed that defendant made a "sale" on August 19, 1975. But when he "purchased" the last block of 105,362 shares is hotly contested. Plaintiff argues that the "purchase" occurred on July 10, when the shares were received, or alternatively, on February 28, when the fiscal year closed, and the entitlement to the shares became "fixed" and calculable. Defendant's contention is that there was no "purchase" in 1975 because the stocks were received as a result of a long-term investment made in

2. There is no dispute between the parties about the circumstances surrounding defendant's acquisition of Gable stock or his subsequent sale, nor about when the various events in these transactions occurred, making disposition by summary judgment appropriate. F.R.Civ.P. 56(c).

3. The Agreement further provided that defendant was to remain as the chief executive officer of Tibbetts under a five year employment contract, and would continue to be a director of Tibbetts.

4. In 1973, Gable "spun off" one of its subsidiaries by distributing stock in the subsidiary to its shareholders. Pursuant to ¶ 3(e) of the Agreement, the Agreement was modified to take account of this change in the structure of Gable. Insofar as is relevant here, the ceiling on the maximum number of stocks that could be distributed to the defendant over the 4 year period was increased by about 15,000.

1972. Secondarily, it is urged that if there was a purchase in 1975, it occurred no later than January (more than six months before the sale), by which time Tibbetts had already earned enough profit to entitle the defendant to all the shares he received in July.

*The Demand Requirement*

[2] A threshold question is raised by plaintiff's undisputed failure to request of Gable Industries that *it* prosecute this claim against defendant before initiating suit in a derivative capacity, as required by § 16(b). Absent such a demand, or a showing that a demand would have been futile, an individual shareholder lacks the capacity under § 16(b) to bring suit.

However, it appears undisputed that Gable Industries has known of this lawsuit since at least November or December of 1976 (deposition of Neal Schachtel, President of Gable Industries, pp. 6–8, 16–21), if not immediately after the suit was commenced (deposition of defendant, pp. 97–98). Under these circumstances, standing to challenge plaintiff's failure to make the demand to sue lies only with the corporation. The "demand provision is for the benefit of the corporation on whose behalf the claim exists . . . ," *Schur v. Salzman,* 365 F.Supp. 725, 732 (S.D.N.Y. 1973) (Weinfeld, J.), and it has frequently been held that only the corporation has standing to object to plaintiff's failure to wait the required sixty days after the demand is made before instituting suit, *Benisch v. Cameron,* 81 F.Supp. 882 (S.D.N.Y.

1948) (Conger, J.); *Grossman v. Young,* 72 F.Supp. 375 (S.D.N.Y.1947) (Rifkind, J.), or to other formal irregularities in the demand. *Schur v. Salzman, supra.* There is no reason for a different rule regarding the demand itself where, as here, the corporation is aware of the lawsuit and is thus able to protect its interests by intervening into the action, if it so chooses. Accordingly, the insider defendant here lacks standing to assert plaintiff's failure as a defense.

*The Merits*

Section 16(b) was designed to discourage the speculative use of inside information by corporate insiders who trade in the stock of the corporation. *See, e. g., Kern County Land Co. v. Occidental Petroleum Corp.,* 411 U.S. 582, 591–92, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973). In order to maximize its effectiveness, the statute "imposes liability without fault."[5] That is, if a transaction of the kind described in § 16(b) occurs, the insider must disgorge his profits without regard to whether he actually used inside information or intended to engage in short-term speculation. *Id.* at 595, 93 S.Ct. 1736. The issue in this case, however, is whether a § 16(b) transaction occurred. More precisely, since the section only applies to purchases and sales that occur within six months of each other, the question presented here is when does a purchase occur within the meaning of § 16(b). Answering that question requires an understanding of the purpose of the six month rule and the "evil" that § 16(b) is designed to remedy.[6]

---

5. *Foremost-McKesson v. Provident Securities Co.,* 423 U.S. 232, 251, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976).

6. The proposition that the legislative purpose behind a statute is a legitimate field of inquiry would not normally require any discussion or support from the authorities. Such is not the case, though, when § 16(b) is at issue, for there are two distinct traditions of construction with regard to this section. The early, "objective" approach, based on the view that the provision's mechanical rules are the only effective means to prevent the trading abuses at which the section aims, *Reliance Electric Co. v. Emerson Electric Co.,* 404 U.S. 418, 422, 92 S.Ct.

596, 30 L.Ed.2d 575 (1972), is that the statute is to be automatically applied to any transaction that falls within its terms, whether or not there is any actual access to inside information or any real potential for speculative abuse. *See, e. g., Popkin v. Dingman,* 366 F.Supp. 534, 537 (S.D.N.Y.1973) (Carter, J.); Note, *Section 16(b) Liability for Profits Realized From a Cash Purchase and Sale Within Six Months of the Securities of Two Issuers Involved in an Intervening Reorganization,* 75 Colum.L.Rev. 1323, 1326–28 (1975), and cases discussed therein. A related notion is that, because the statute is remedial in nature, it is to be applied "as broadly as the language permits," *Popkin v. Dingman, supra,* 366 F.Supp. at 537, "resolving all doubts and

Although the statute is intended to curb the use of advance knowledge of privileged information by insiders in their market transactions, it is not concerned with *all* forms of such insider abuse, *see Foremost-McKesson v. Provident Securities Co.,* 423 U.S. 232, 255, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976); *Provident Securities Co. v. Foremost-McKesson,* 506 F.2d 601, 615 (9th Cir. 1974), *aff'd,* 423 U.S. 232, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976), such as simply selling or buying on the basis of advance information.[7] Rather, the particular abuse at which § 16(b) takes aim is an investment decision by an insider, based on inside information, to engage in "in-and-out" or "out-and-in" trading, with the goal of reaping a profit because of advance knowledge of events. "Congress had in mind [only] a specific type of two-part transaction":[8] a purchase and sale, or sale and purchase, which are but two parts of a single plan to gain advantage of knowledge of information of a limited circulation. It was recognized, however, that *proof* that trading was based on inside information and was purely for speculative, rather than investment purposes, would be hard to come by. But it was also realized that "since the speculative advantage to be gained from inside information is usually short lived,"[9] a short term

ambiguities against insiders." *Blau v. Oppenheim,* 250 F.Supp. 881, 884–85 (S.D.N.Y.1966) (footnote omitted). (Weinfeld, J.). *See Adler v. Klawans,* 267 F.2d 840, 846–47 (2d Cir. 1959).

Recently, however, the Supreme Court has taken the view that, at least with regard to "unorthodox" or "borderline" transactions, a more pragmatic or subjective approach to the interpretive task is appropriate.

"The statutory definitions of 'purchase' and 'sale' are broad and, at least arguably, reach many transactions not ordinarily deemed a sale or purchase. In deciding whether borderline transactions are within the reach of the statute, the courts have come to inquire whether the transaction may serve as a vehicle for the evil which Congress sought to prevent . . . thereby endeavoring to implement congressional objectives without extending the reach of the statute beyond its intended limits. . . . [Because of the liability without fault nature of the section] the prevailing view is to apply the statute only when its application would serve its goals."

*Kern County Land Co. v. Occidental Petroleum Corp.,* 411 U.S. 582, 593–95, 93 S.Ct. 1736, 1744, 46 L.Ed.2d 464 (1973).

The distinction between borderline or unorthodox transactions and garden-variety ones is not overly bright; indeed, it is not clear whether the Court was announcing a rule only with regard to unusual financial arrangements, or was describing the proper approach towards *any* close question of § 16(b) construction. *See id.,* at 594 n.26, 93 S.Ct. 508. But it is not necessary to resolve these issues and classify the transaction at hand as orthodox or borderline in this case. I am not called upon, as the Court was in *Kern County,* to exempt from liability a transaction that on its face falls within the terms of § 16(b). The problem in this case is simply to determine whether *by its terms* § 16(b) may be properly invoked in respect to the transactions at issue here. To do

so, it is necessary to seek guidance from the legislative purpose underlying the statute. Indeed, it has always been appropriate to undertake this inquiry "where alternative constructions of the terms of § 16(b) are possible . . .." *Reliance Electric Co. v. Emerson Electric Co., supra,* 404 U.S. at 424, 92 S.Ct. [596] at 600. *See id.* at 424 n.4, 96 S.Ct. 596; *Adler v. Klawans, supra,* 267 F.2d at 844; *Blau v. Ogsbury,* 210 F.2d 426, 427 (2d Cir. 1954); *Smolowe v. Delendo Corp.,* 136 F.2d 231, 235–36 (2d Cir. 1943). Even under the "objective" approach, § 16(b), like any other statute, is to be read and applied in the light of its underlying purposes. That the statute is remedial and "has a wholesome purpose . . . begs the real question: what *is* that purpose?" *Allis-Chalmers Manufacturing Co. v. Gulf & Western Industries, Inc.,* 527 F.2d 335, 346 (7th Cir. 1975), *cert. denied,* 423 U.S. 1078, 96 S.Ct. 865, 47 L.Ed.2d 89, 424 U.S. 928, 96 S.Ct. 1142, 47 L.Ed.2d 338 (1976). The "objective" approach, however formulated, does not mandate an application of § 16(b) that is nonsensical in terms of its intended reach.

7. "Congress . . . did not intend section 16(b) to apply to every *separate* purchase or sale as to which some use of inside information is a theoretical possibility." *Allis-Chalmers Manufacturing Co. v. Gulf & Western Industries, Inc., supra,* note 6, 527 F.2d at 346. *See Blau v. Max Factor & Co.,* 342 F.2d 304, 309 (9th Cir.), *cert. denied,* 382 U.S. 892, 86 S.Ct. 180, 15 L.Ed.2d 150 (1965).

8. *Allis-Chalmers Manufacturing Co. v. Gulf & Western Industries, Inc., supra* note 6, 527 F.2d at 346.

9. *Provident Securities Co. v. Foremost-McKesson, Inc.,* 506 F.2d 601, 609 (9th Cir. 1974), *aff'd,* 423 U.S. 232, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976).

turn-over in stock was far more likely to be a speculative adventure to capitalize on inside information than a pair of widely spaced trades. Congress thus overcame this serious obstacle to effective remediation by engaging in the conclusive presumption that two trades by an insider within six months of each other were speculative and based on inside information.[10]

That this is the proper reading of the purpose of § 16(b) and the rationale of the six month rule is clear from the section's legislative history. The original version of what was to become § 16(b) of the 1934 Act provided, in pertinent part, as follows:

"It shall be unlawful for any [insider]— (1) To purchase any . . . security *with the intention or expectation* of selling the same security within six months; and any profit made by such person on any transaction in . . . a . . . security extending over a period of less than six months shall inure to and be recoverable by the issuer, *irrespective of any intention or expectation* on his part *in entering into such transaction* of holding the security purchased for a period exceeding six months." *Hearings on S.Res. 56 and S.Res. 97, Before the Senate Comm. on Banking & Currency,* 73d Cong., 1st Sess., Pt. 15, at 6430 (1934) (emphasis added) ("Hearings").

Thomas Corcoran, a spokesman for the drafters of the bill, explained to the committee the rationale behind the section's rules:

"You hold the director, irrespective of any *intention or expectation to sell* the security *within 6 months after,* because it will be absolutely impossible to prove the existence of *such intention or expectation,* and you have to have this crude rule of thumb [of 6 months], because you can-

not undertake the burden of having to prove that the director *intended, at the time he bought,* to get out on a short swing." *Hearings,* at 6556–57 (emphasis added).

From the form of the initial draft of § 16(b) and the explanation of Mr. Corcoran, it is apparent that the target of the bill was a form of investment activity composed of two trades made pursuant to a single, and pre-existent, plan of investment. What was made unlawful was "[t]o purchase . . . with the intention . . . of selling . . . within six months . . . ." And the six month rule was enacted as a conclusive presumption regarding the insider's intentions "at the time he bought. . . ."

In response to various criticisms of the provision voiced at the hearings on the bill, the provision was redrafted. As enacted, § 16(b) does not so unambiguously indicate that the sole target of the section was a plan of investment activity formulated prior to the initial trade. There is no indication, however, that Congress, in revising the provision, intended to shift its focus in this regard.

"The primary substantive criticism"[11] of the draft was that its reach did not extend to sale-purchase, as well as purchase-sale, activity. To remedy this, as well as other faults of a more technical nature, the bill was reworked into a form almost identical to the section as finally enacted. "The other major substantive change effected" by the revision "was the elimination of the potential criminal liability."[12] To make these changes, the structure and language of the provision were changed in significant regards—in particular, the declaration that it was unlawful to purchase "with the in-

---

**10.** As the 7th Circuit explained the logic behind § 16(b)'s rules,

"the position of director, officer, or beneficial owner results in a presumption of access to inside information, and the short-term nature of the transaction results in a presumption that this information motivated a coordinated short-term turn-over. Difficulties in proving either access or motivation justify the conclusiveness of these presumptions."

*Allis-Chalmers Manufacturing Co. v. Gulf & Western Industries, Inc., supra* note 6, 527 F.2d at 347–48.

**11.** *Foremost-McKesson v. Provident Securities Co., supra* note 5, 423 U.S. at 247, 96 S.Ct. 508.

**12.** *Id.* at 248 n. 23, 96 S.Ct. at 518.

tention" of selling within six months disappeared. But there is no reason to believe that Congress, in refining this section, meant also to alter the purpose of § 16(b) in any fundamental way. Indeed, retention of the language which obviates the need for independent proof of the insider's "intention . . . in entering into such transaction" indicates precisely the opposite: Congress' concern was still with a coordinated two-part transaction motivated from the start by a desire to speculate, and the fact that two transactions occurred in quick succession was taken to be sufficient proof that the transactions were so coordinated and so motivated. Cf. *Allis-Chalmers Mfg. Co. v. Gulf & Western Industries, Inc.,* supra, note 6, 527 F.2d at 347.[13]

 There are several points about the purpose and structure of § 16(b) that are germane to the determination of the question presented in this case. First, the section is concerned with a form of investment activity engaged in pursuant to a *plan,* for-

mulated prior to or simultaneously with the first of two trades. Second, the kind of plan aimed at is a scheme to *speculate,* which means, in the context of § 16(b), a desire to reap a profit from short term market activity that does not effect any change in the investor's long term investment commitments. Third, the section looks to the timing of the investor's activities itself as the sole and conclusive indicator of whether or not there was such a plan to so speculate. And fourth, what the section "times" are changes in the investor's commitment in the market—how quickly he gets in and out (or out and in).

 With these points in mind, it is apparent that the critical moment in the initial "purchase" or "sale," for the purpose of determining when that transaction occurred within the meaning of § 16(b), is that point at which the investor becomes irrevocably committed to the transaction and, in addition, no longer has control over the transaction in any way that could be

---

**13.** In adopting the unitary transaction reading of § 16(b), propounded most forcefully in *Allis-Chalmers, supra* note 6, I am aware that this interpretation cannot be reconciled with the holding of *Adler v. Klawans, supra* note 6. There, the Second Circuit held that § 16(b) covered a purchase and sale by a person who became a director *after* the purchase, but before the sale. This result cannot be justified under the unitary transaction theory.

The *Adler* court relied on three factors in reaching its result. First, it saw the purpose of § 16(b) as being simply to discourage insider use of inside information in *any* transaction in the stock of the corporation. The opinion did not discuss or indicate reliance upon any of the materials in the legislative history for this view. Nor did it discuss the function and purpose of the six month rule under such a reading. Second, because the statute was remedial in purpose, the court, in selecting between rational interpretations of the provision, selected the one that extended, rather than limited, liability. Lastly, the court noted the specific proviso with regard to beneficial owners: no liability can attach unless the person was a beneficial owner "both at the time of the purchase and sale, or the sale and purchase . . . ." Applying the maxim of *expressio unius est exclusio alterius,* the court drew the inference that Congress intended the "pre-existent insider status" rule not to apply to directors and officers.

It cannot be known whether the Second Circuit today, after canvassing the legislative materials discussed here and emphasized in cases

such as *Foremost-McKesson* and *Allis-Chalmers,* would reaffirm *Adler's* view of the evil § 16(b) is concerned with. Nor can it be known whether, after such a review, the Second Circuit would still find the *Adler* rule a reasonable interpretation of the section. But it is clear that since we are dealing with a beneficial owner, the proviso is applicable in this case, and a critical element of the reasoning in *Adler* is not. The statute requires that a beneficial owner have insider status before the first of the two transactions, *Foremost-McKesson, supra,* and this requirement is completely consistent with the unitary transaction theory. With regard to beneficial owners, the reasoning of *Adler* is no bar to the approach I take here.

Of course, application of both the *Adler* rule and, with regard to beneficial owners, the unitary transaction theory results in an anomaly: the statute is aimed at one kind of trading activity and abuse where directors and officers are concerned, and quite another in respect to beneficial owners. This anomaly, however, is inherent in the *Adler* rule itself and the differential treatment of directors and beneficial owners which it enshrines. At the least, the unitary transaction theory is firmly supported by the legislative history and the general structure of the statute, and is consistent with the beneficial owner proviso and its interpretation in *Foremost-McKesson.* That it does not explain the result in *Adler* is a difficulty that need not now be solved.

turned to speculative advantage by the investor. It is at that moment that the decision to invest is made and the power to manipulate the transaction is lost. Insofar as the six-month rule is a presumption concerning the motivation of that decision, it is the moment of that decision that governs the construction of § 16(b). The technicalities of stock transfers, such as the passing of title or the exchange of the shares are, by themselves, of no import for § 16(b) purposes. *See Provident Securities Co. v. Foremost-McKesson, supra,* 506 F.2d at 606; *Blau v. Ogsbury,* 210 F.2d 426, 427 (2d Cir. 1954); *cf. Foremost-McKesson v. Provident Securities Co., supra,* 423 U.S. at 254 n.28, 96 S.Ct. at 521 n.8, ("[A]s a matter of practicalities the crucial point in the acquisition of securities is not the technical 'purchase,' but rather the decision to make an acquisition").

▮ Applying this reading of the statute, the defendant "purchased" all his stock in Gable in 1972, regardless of when he came into possession of them. In June of that year, he "tendered" the entire consideration for the stock he was "purchasing"—his company and the Gable subsidiary merged, and his stock in Tibbetts was converted into Gable stock: 218,330 shares immediately plus the right to receive more in the future. Upon the effective date of the merger, the defendant's commitment to purchase became irrevocable (indeed, the purchase was executed) and the size of *his* investment was fixed—he had just sold his ownership interest in his company. To be sure, it was not known at that time what the total value, and hence number, of the Gable stock defendant was purchasing would prove to be. Nor was it known precisely when the defendant would be receiving some of the shares he was purchasing. But none of these uncertainties, of course, changes the immutable fact that the extent of the defendant's investment was already sealed. Nor can it be fathomed how they could be turned to speculative advantage by the defendant. His control over the value and number of the additional stock he could receive was limited to the effect his efforts would have on the profitability of Tibbetts.

To the extent that this constituted continuing control over the purchase, it surely did not present an opportunity to engage in speculative manipulation such as the section is aimed at. No doubt the defendant attempted through his efforts to maximize the value of the stock he was purchasing, but this opportunity could not bestow upon him any *speculative* advantage. Nor does the fact that the per-share "price" of what defendant had purchased would only be known shortly before the last of the additional stock was delivered to him raise the spectre of short term speculation. This information clearly was of great interest to the defendant, but having made his investment years beforehand, his interest in learning the wisdom of his investment decision was no different than that of any other long term investor. Similarly, the uncertainty about the dates that any additional stock would be delivered to the defendant is of no consequence, even if it is assumed that the date of delivery could be of any significance in terms of an opportunity to speculate, for the defendant did not have the power to determine when the stock would be delivered.

The result reached here draws support from *Blau v. Ogsbury,* 210 F.2d 426 (2d Cir. 1954). In *Blau,* the defendant, a corporate executive, was given as part of his compensation an option to purchase 10,000 shares of the corporation at a set price. The option agreement provided that a formal notice of election to exercise the option would obligate the defendant for the purchase price, but that the defendant could choose to defer payment for as long as he remained employed by the issuer, with title, possession and stockholder rights remaining with the issuer until the price was paid. Defendant gave notice of election in 1945, but did not pay the price and receive the shares until 1948. Shortly before he made payment, the defendant sold 600 other shares of the same corporation at a price much higher than the option price. Suit was brought to recover defendant's profits; the critical § 16(b) question was to determine when the purchase occurred. The Second Circuit held that

"the 'purchase' was consummated in 1945 when Ogsbury mailed his notice of election and thereby incurred an irrevocable liability to take and pay for the stock. Thereafter for all speculative purposes he owned the stock.

. . . [T]he time when the alleged insider's rights and obligations became fixed [is] controlling in the application of the statute . . . .

. . . It matters not to the speculator who has title or possession or who can vote the stock or receive dividends. What he needs is firm assurance that a fixed quantity can be acquired or disposed of at a fixed price; and his commitments are on that basis. And speculation, actual or potential, is the only vice within the purview of § 16(b)."

*Id.* at 427. Allowing for factual differences between the two cases, the reasoning there is applicable here. Having fully paid for the stock in 1972, the defendant owned the stock for all speculative purposes. His obligations were not only fixed, they had been discharged by him. And as discussed above, that the full value of his rights under the contract or the quantity of shares he was to receive was unknown in 1972 could have been of no import to the potential speculator.

Plaintiff contends that the decision in this case is controlled by *Booth v. Varian Associates,* 334 F.2d 1 (1st Cir.), *cert. denied,* 379 U.S. 961, 85 S.Ct. 651, 13 L.Ed.2d 556 (1965), and *Lewis v. Realty Equities Corp. of New York,* 373 F.Supp. 829 (S.D.N. Y.1974) (Carter, J.), cases which differ from the result reached here. For reasons that differ as to each case, I must disagree.

In *Booth,* the defendants, directors of Varian, contracted with Varian in 1959 to exchange their 20% holding in another firm (Bomac Laboratories) for stock in Varian, the amount to be determined at the closing, set for July 2, 1962. The amount was to be that number of Varian shares which, based on the closing price of Varian the day before the closing, would equal in value $2 million plus a percentage of the "excess" earnings of Bomac in the month before the closing. In short, defendants were selling their ownership interest in a corporation and buying Varian stock, the number to be determined in part by the future earnings of the "sold" company and the future price of Varian—an arrangement very similar to that in the present case. The closing date, which could be accelerated by Varian and, in limited circumstances, by the defendants, was in fact accelerated three days by Varian to June 29, 1962, when the exchange of stock took place. Within six months of the closing, defendants sold some of the Varian stock, and suit was brought to recover the profit. Despite the fact that the 1959 agreement "firmly committed" both parties to an eventual exchange of shares, the 1st Circuit held that the purchase of Varian stock occurred at the closing, in 1962. I disagree with that analysis and must decline to follow it.[14]

In reaching its decision, the *Booth* court relied most heavily on the fact that the number of shares being purchased and the per-share price was unknowable until the closing date. The court does not explain what significance this has for § 16(b) purposes, and for the reasons discussed above, I fail to see any. The position of the defendants in *Booth,* and in this case, is the same as that of an investor who purchases stock that is not transferable for a period of time. Such an investor would obviously like to know what the per-share price and total value of the stocks he purchased is going to be on the day he is free to sell them, but his curiosity does not alter the fact that his investment has already been made, and that whatever the answers to those questions turn out to be, the opportunity to speculate *by making an investment* has long since passed.

14. *Booth* is arguably distinguishable on the grounds that the *Booth* defendants, unlike defendant here, did not tender their shares until they received the Varian shares. But as *Blau v. Ogsbury, supra,* makes clear, the difference between an executed purchase and an irrevocable commitment to purchase is immaterial for § 16(b) purposes. I cannot rely, therefore, on this factual difference between the two cases.

Plaintiff also relies on *Lewis, supra,* an earlier opinion of this court. In *Lewis,* the defendant ("REC") contracted with certain shareholders of First National Realty & Construction Corp. ("FNR") to exchange 51,000 shares of REC for 306,000 shares of FNR. The obligations of both sets of parties were dependent upon the fulfillment of certain conditions precedent. By September 18, 1968, the FNR shareholders had performed all the conditions requisite to REC's obligation, but REC had not undertaken an act required to fix the obligations of the FNR shareholders. By October 22, 1968, all the conditions had been fulfilled, and the exchange occurred. Within 6 months of October 22, but more than 6 months after September 18, REC disposed of a block of FNR shares. It was held that REC's purchase of FNR stock occurred on the date of the exchange, and not on September 18.

*Lewis* is distinguishable from the case at bar. The holding in *Lewis* turned on the fact that although, on September 18, the purchaser's "obligations" had become irrevocable, it had not performed an act necessary to the execution of the exchange. The purchaser thus still had the power to affect when the transfer would occur. That power to determine when the investment would be made could conceivably have been used for speculative purposes, especially since the value of both what the defendant was purchasing and what he was purchasing it with would vary daily while the exchange was pending. Here, however, the defendant did not control when he would receive the shares and, in any case, he had already parted with the consideration for the stock he was receiving. His only interest at that point was to receive the additional stock as soon as possible so that, if he wished, he could liquidate the investment he had made years beforehand.

In conclusion, on the facts of this case, it would be contrary to the intent of § 16(b) to characterize either the date of receipt of the stock, or the date when the number of shares due could finally be calculated precisely, as a "purchase." Therefore, since no material facts remain in dispute, summary judgment is granted in favor of the defendant.

IT IS SO ORDERED.