**PIANO REMITTANCE CORPORATION, Plaintiff,**

v.

**RELIANCE FINANCIAL SERVICES CORPORATION, and Walt Disney Productions Corporation, Defendants.**

**No. 84 Civ. 4248 (WCC).**

United States District Court, S.D. New York.

Sept. 30, 1985.

Mordecai Rosenfeld, and Milberg Weiss Bershad Specthrie & Lerach, New York City, for plaintiff; Richard M. Meyer, New York City, of counsel.

Willkie Farr & Gallagher, New York City, and Blair C. Fensterstock, New York City, for defendant Reliance Financial Services Corp.; Anthony F. Phillips, Gerald Kerner, Lawrence O. Kamin, Laurence H. Lenz, Jr., New York City, of counsel.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

Plaintiff Piano Remittance Corporation ("PMC") brought this shareholder's derivative suit on behalf of Walt Disney Productions Corporation ("Disney") alleging that defendant Reliance Financial Services Corporation ("Reliance") is liable to Disney under § 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b) (1982), for

profits it made on short-swing trading in Disney stock. Section 16(b) provides that a corporation can require certain inside traders, statutorily defined as the corporation's directors and officers and beneficial owners of more than 10% of the corporation's outstanding stock, to disgorge the profits they realize on any purchase and sale of the corporation's securities within a six-month period. Plaintiff alleges that Reliance is liable to Disney for the profits it made when, as a beneficial owner of more than 10% of Disney's outstanding stock, it purchased 748,000 Disney shares and sold them less than six months later.

Section 16(b) provides that in order for a beneficial owner to be subject to the statute's proscriptions, he must have been a 10% shareholder "both at the time of the purchase and sale ... of the security involved." Reliance has moved to dismiss plaintiff's complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure on the ground that it was not a 10% Disney shareholder at the time of the purchase of the stock at issue here. For the reasons stated below, Reliance's motion is denied.

*Background*

For the purposes of this motion, the allegations of PMC's complaint must be taken as true. *Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972); *Joyce v. Joyce Beverages, Inc.*, 571 F.2d 703, 706 (2d Cir.), *cert. denied*, 437 U.S. 905, 98 S.Ct. 3092, 57 L.Ed.2d 1135 (1978). Accordingly, these are the relevant facts:

In April 1984, Reliance owned 3,198,233 Disney shares, or approximately 9.3% of Disney's outstanding stock. Complaint ¶ 5(b). Sometime thereafter, Reliance instructed its broker, Salomon Brothers, to purchase an additional 1,000,000 Disney shares for its account. *Id.* ¶ 5(c). Salomon Brothers purchased those shares for Reliance from several sources over several days, and transferred formal title to Reliance on May 1, 1984 when the 1,000,000 shares crossed the tape of the New York Stock Exchange at $65.50 per share. *Id.* With this purchase, Reliance owned approximately 12.2% of Disney's outstanding

stock. *Id.* ¶ 6(a). On June 11, 1984, Reliance sold the 1,000,000 shares it had purchased to Disney itself for $70.83 per share, thereby making a profit of at least $5.20 per share. *Id.* ¶ 7.

Plaintiff alleges that Reliance reached the 10% shareholder threshold as soon as Salomon Brothers purchased 252,000 shares for its account, and therefore that Reliance is subject to § 16(b) liability for the 748,000 shares it purchased after that point. *Id.* ¶¶ 5(d), 8(a), 9. Reliance argues, however, that its block purchase was a single transaction, and that it cannot be subject to § 16(b) liability since it was only a 9.3% shareholder at the time it bought the entire 1,000,000 shares.

*Discussion*

Before turning to the merits of this motion, I take a moment to note that since this is a motion to dismiss, my task is a limited one. My role at this stage of the litigation is not to assess the strength or weakness of plaintiff's case, but only to determine whether plaintiff is entitled to offer evidence to support its claim. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). I may not dismiss the complaint unless it appears beyond doubt that plaintiff could prove no set of facts in support of its claim that would entitle it to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

The parties agree that the resolution of this motion lies in an appropriate interpretation of the Supreme Court's decision in *Foremost-McKesson, Inc. v. Provident Sec. Co.,* 423 U.S. 232, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976). Of course, they disagree as to what that interpretation should be.

Briefly stated, the facts of *Foremost* are as follows: Provident Securities Company ("Provident") was a holding company that decided to dissolve and liquidate its assets. After extensive negotiations, Foremost-McKesson, Inc. ("Foremost") agreed to buy Provident's assets in part with cash and in part with its own securities. At the closing of their deal, Foremost delivered to Provi-

dent the cash and a debenture which was immediately convertible into more than 10% of Foremost's outstanding common stock. Less than six months after the closing, Provident sold the debenture to a group of underwriters, distributed the proceeds to its shareholders, and dissolved. Realizing that Foremost might sue it to recover any profits realized on the sale of the debenture to the underwriters, Provident sued for a declaration that it was not liable to Foremost under § 16(b). The Court of Appeals for the Ninth Circuit held that Provident was not liable on the ground that it was not a beneficial owner of 10% of Foremost's outstanding stock "at the time of the purchase." *Provident Sec. Co. v. Foremost-McKesson, Inc.,* 506 F.2d 601 (9th Cir.1974), *aff'd,* 423 U.S. 232, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976). The court ruled that in a purchase-sale sequence the phrase "at the time of the purchase" "must be construed to mean prior to the time when the decision to purchase is made." *Id.* at 614. Since Provident was not a 10% owner at the time it decided to acquire the Foremost securities, the court concluded that it was not subject to § 16(b).

The Supreme Court affirmed the court of appeals, holding that "in a purchase-sale sequence, a beneficial owner must account for profits only if he was a beneficial owner 'before the purchase.'" 423 U.S. at 250, 96 S.Ct. at 519. In reaching this conclusion, the Court considered the purpose and legislative history of § 16(b). The Court explained that Congress was concerned that insiders sometimes have access to information that is not available to the rest of the investing public, and that by trading on this information, insiders can reap profits at the expense of less-knowledgeable investors. *Id.* at 243, 96 S.Ct. at 515–16. Congress believed that the potential for insider abuse was particularly great in the area of short-term speculative trading, and in enacting § 16(b), it attempted to curb this evil by removing all profitmaking incentive. *Id.* As the Court explained, Congress did this by (1) creating a conclusive presumption that all officers, directors, and

beneficial owners of more than 10% of a corporation's outstanding stock have access to inside information, and (2) enacting a "flat rule" that a corporation could recover the profits these insiders make on any purchase and sale of the corporation's stock within a six-month period. *Id.* at 243–44, 96 S.Ct. at 515–16.

After examining the general purposes of the statute, the Court turned to an analysis of the phrase "at the time of the purchase." It concluded, for two principal reasons, that this phrase should be construed to mean that a beneficial owner is subject to § 16(b) liability only if he was a 10% owner before the purchase in question. First, the Court noted that in previous drafts, the statute explicitly limited liability to beneficial owners who had achieved that status before the purchase at issue. *Id.* at 248, 96 S.Ct. at 518. Second, the Court explained that while Congress believed that all corporate officers and directors could be presumed to have access to inside information, it believed that the only shareholders who could be so presumed were those who owned more than 10% of the corporation's stock. Since it was speculation on inside information that Congress sought to curb, and since Congress was unwilling to presume that a beneficial owner had inside information until he was a 10% owner, the Court concluded that the purchase that took an investor from less than 10% to more than 10% ownership could not properly be considered a purchase within the coverage of § 16(b).[1] *Id.* at 253–54, 96 S.Ct. at 520–21.

In support of its conclusion, the Supreme Court emphasized that if a purchaser did not own more than 10% of the corporation's outstanding stock before making a purchase, his decision to buy could not be presumed to have been based on inside information. The Court noted that "as a matter of practicalities *the crucial point in the acquisition of securities is not the technical 'purchase,' but rather the decision to make an acquisition.*" *Id.* at 254 n. 28, 96 S.Ct. at 521 n. 28 (emphasis added). The Court then stated, in terms Reliance contends are particularly relevant here, that

> [i]n the case of an acquisition of a large block of a corporation's stock, that decision may precede the "purchase" by a considerable period of time. A prudent investor will want to investigate all available information on the corporation. Such an investor also may need time to finance the purchase, and may wish to effectuate purchases without influencing the market price. *These realities emphasize that the acquisition decision by a beneficial owner normally will occur well in advance of the event that is presumed to afford access to inside information.*

*Id.* (emphasis added).

Reliance contends that with these statements, the Supreme Court made clear that a purchaser can be liable under § 16(b) only if he was a 10% shareholder *at the time he decided to buy* the stock in question. Reliance argues that the complaint in this case can be read to allege only one decision to purchase Disney stock—that is,

---

**1.** Thus, the Court explained that under its holding, the facts of *Reliance Electric Co. v. Emerson Electric Co.,* 404 U.S. 418, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972), would not give rise to § 16(b) liability even though the Court had upheld liability in that case just a few years earlier. In that case, Emerson acquired 13.2% of the shares of Reliance's predecessor pursuant to a tender offer, and within a six-month period, disposed of its holdings in two sales of 3.24% and 9.96% respectively. The Court of Appeals for the Eighth Circuit held that the purchase made Emerson a 10% shareholder and subjected it to the insider trading rules of § 16(b). However, it ruled that Emerson was liable for the profits only on its first sale, because "at the time of … sale" of the remaining 9.96% of the stock, it was no longer a 10% owner.

The Supreme Court granted certiorari on Reliance's petition to review the lower court's construction of the "at the time of … sale" provision, and affirmed. The construction of the "at the time of purchase" language was not before the Court, and accordingly the Court did not reach it. Thus, in *Foremost* the Court stated that "Emerson … remained liable for the 3.24% sale, *although it would have had no liability under our holding today.*" 423 U.S. at 250 n. 25, 96 S.Ct. at 519 n. 25.

when Reliance instructed its broker to purchase the 1,000,000 share block for its account. Reliance argues that since the complaint alleges that at the time it gave this instruction to Salomon Brothers it was only a 9.3% shareholder of Disney stock, it cannot be subject to § 16(b) liability.

Yet, while the Supreme Court noted in *Foremost* that the crucial point in the purchase of stock for § 16(b) purposes is the decision to buy and not the technical transfer of ownership, the Court did not indicate how to identify when a decision to purchase has been made. Reliance offers a common-sense answer; it contends that it made a decision to purchase when it instructed its broker to purchase the 1,000,000 share block of Disney stock for its account. Plaintiff, however, argues that this approach has the potential to frustrate the legislative aim of § 16(b); it argues that Reliance should not be considered to have made a "decision to buy" for § 16(b) purposes until it was "irrevocably committed" to the transaction—that is, until it "no longer ha[d] control over the transaction in any way that could be turned to [its] speculative advantage...." *Prager v. Sylvestri*, 449 F.Supp. 425, 432–33 (S.D.N.Y.1978).

Plaintiff concedes that if Reliance was irrevocably committed to purchasing all 1,000,000 shares when it placed its instruction with its broker, it could not be liable under § 16(b) as a matter of law. Plaintiff acknowledges that this case would then be identical to *Foremost*—like Provident, Reliance would have gone from a less than 10% to more than 10% owner in an instant, and could not be held liable because it would not have been a 10% owner before the purchase in question. However, plaintiff argues that since Reliance's block purchase was not executed in an instant, but rather through many transactions over several days, this case presents an opportunity for speculation on inside information that was not present in *Foremost*. Plaintiff argues that if Reliance was not irrevocably committed to buying the entire block at the time it placed its order, it could have reached the 10% owner threshold before making a decision whether to purchase the

balance of the block. Plaintiff argues that at that point, Reliance must be presumed to have had access to inside information, and the 748,000 shares it bought after it reached the 10% shareholder level should be subject to the disgorgement rules of § 16(b).

■ In view of the purposes of § 16(b), the Court finds plaintiff's reasoning persuasive. Indeed, any other result would potentially frustrate Congress's attempt to impose a complete ban on short-term insider trading. Courts have repeatedly stated that since § 16(b) is a remedial statute, "it must be strictly construed in favor of the corporation and against any person who makes profit dealing in the corporation stock." *Adler v. Klawans*, 267 F.2d 840, 846–47 (2d Cir.1959); *Lewis v. Realty Equities Corp.*, 373 F.Supp. 829, 831 (S.D.N.Y. 1974) (quoting *Adler*). Of course, the Court cannot extend the statute beyond the limits set by Congress, but I think it is plain that the construction offered by plaintiff is the only one consistent with the legislative intent of § 16(b).

Moreover, the concept that a purchaser cannot be said to have "purchased" stock for § 16(b) purposes until he is irrevocably committed to the transaction is a familiar one, albeit in a slightly different context. In determining whether § 16(b) applies to particular cases, courts often have had to decide whether a purchase and sale were made within a six-month period. Courts in this circuit have consistently held that a purchaser becomes a beneficial owner at the moment at which he is "irrevocably committed" to the transaction in question. *See, e.g., Stella v. Graham-Paige Motors Corp.*, 232 F.2d 299, 301 (2d Cir.), *cert. denied*, 352 U.S. 831, 77 S.Ct. 46, 1 L.Ed.2d 52 (1956); *Blau v. Ogsbury*, 210 F.2d 426, 427 (2d Cir.1954) (purchase occurred at time when the insider's "rights and obligations became fixed"); *Prager*, 449 F.Supp. at 432–33. Like the Supreme Court in *Foremost*, these courts have found that the time at which stock ownership is technically transferred is irrelevant

for § 16(b) purposes. Instead, they have focused on when the purchaser is irrevocably committed to buy because it is at that point that he loses the power to take advantage of any inside information he might later acquire. *See Stella,* 232 F.2d at 301; *Blau,* 210 F.2d at 427; *Prager,* 449 F.Supp. at 432–33. Since the same concern is at issue here, it seems appropriate to employ the same concept to address it.

 Therefore, for all of these reasons, I conclude that Reliance cannot avoid liability simply by pointing to the fact that it owned less than 10% of Disney's outstanding shares when it told its broker to buy the 1,000,000 additional shares for its account. In order to avoid liability, Reliance also must show that it had an irrevocable commitment to buy those shares once it placed its order. Reliance has suggested that under New York law, it was obligated to purchase the shares at the time it placed its order so long as its broker was able to assemble the block. However, it cites only one case for that proposition, *Billings Assocs., Inc. v. Bashaw,* 27 A.D.2d 124, 276 N.Y.S.2d 446 (4th Dep't 1967), and even a cursory review of that case reveals that it does not stand for what Reliance says it does.[2] Accordingly, I conclude that Reliance has failed to demonstrate that it was irrevocably committed to purchase the entire 1,000,000 share block of Disney stock when it placed its order with its broker.

For all of the reasons set forth above, I conclude that plaintiff might be able to prove a set of facts that would entitle it to relief; for that reason, Reliance's motion to dismiss the complaint for failure to state a claim must be denied. The parties are directed to proceed with discovery and to appear for a pretrial conference on Friday, October 25, 1985 at 11:00 A.M. in Courtroom 618.

SO ORDERED.

---

2. In *Bashaw,* a securities broker sued a customer for damages it suffered when the customer failed to pay for securities the broker purchased for him. The Supreme Court, Appellate Division ruled that the broker was entitled to recover its damages, stating that "[d]efendant, by his failure to repudiate his agent's order for the stock in question, bound himself to the agreement with plaintiff that plaintiff would purchase the stock for defendant and defendant would pay for it." 27 A.D.2d at 126, 276 N.Y. S.2d at 447. This holding makes clear that where a broker executes a purchase on behalf of a customer, the customer is obligated to pay for the stock if he fails to cancel his instruction to buy. However, the case does not address the question presented here—whether a customer such as Reliance is committed to pay its broker for an entire block purchase *as soon as* the customer places its order.