Stephen J. DiLORENZO, derivatively, on behalf of SMITHFIELD FOODS, INC., Plaintiff,

v.

Wendell H. MURPHY, et al., Defendants.

No. 03 CIV. 8624(JSR).

United States District Court, S.D. New York.

June 22, 2004.

---

17. Tr. 558–573.

18. 28 U.S.C. § 2254(e)(1).

Glenn F. Ostrager, Ostrager, Chong, Flaherty & Broitman, P.C., New York City, for Plaintiff.

Dennis H. Tracey, III, James Inkyo Rim, Hogan & Hartson, LLP, Marshall Beil, McGuire Woods LLP, New York City, Bryan A. Fratkin, J. William Boland, Richard Cullen, McGuire Woods LLP, Richmond, VA, for Defendants.

## MEMORANDUM ORDER

RAKOFF, District Judge.

Pursuant to Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), plaintiff Stephen J. DiLorenzo brings this derivative action on behalf of Smithfield Foods, Inc. ("Smithfield") seeking disgorgement of "short-swing" profits from the defendants Wendell H. Murphy, Harry D. Murphy, Joyce Murphy Minchew, Wendell H. Murphy, Jr., Wendy Murphy Crumpler, Stratton K. Murphy, Marc D. Murphy, and Angela Norman Brown. The defendants move, *inter alia,* for summary judgment in their favor.

The facts pertinent to the summary judgment motion are undisputed. On January 28, 2000, the defendants sold a number of businesses (the "Acquisition Businesses") to Smithfield in exchange for Smithfield common stock. *See* Affidavit of Brewer Ezell sworn to January 29, 2004 ("Ezell Aff.") at ¶ 2. The contract of sale (the "Acquisition Agreement") provided that the number of Smithfield shares issued to the defendants as consideration for the sale of the Acquisition Businesses would bear a fixed relation to the financial performance of the Acquisition Businesses, which would be determined, in turn, by an accounting to be made in accordance with certain financial criteria specified in the Acquisition Agreement. *See* Ezell Aff. Ex. A ("Acquisition Agreement") at § 2.4. Thus, as a result of the accounting, a final purchase price would be determined, which would then be translated into a fixed quantity of Smithfield common stock based on the closing price of that stock on January 28, 2000. *Id.*

In effectuation of this arrangement, it was further agreed that on or about January 28, 2000, Smithfield would issue to the defendants some 11,054,396 shares of Smithfield common stock, of which 10,054,396 shares would be transferred immediately to the defendants and the remaining 1,000,000 shares would be placed in escrow. Ezzell Aff. ¶¶ 3–4. Depending on the results of the accounting, the defendants would (a) receive some or all of the escrow shares, (b) receive additional shares ("earn out" shares) in addition to the escrow shares, or (c) be required to return some of the 10,054,396, shares they had received. *See* Acquisition Agreement at § 2.4.

As it happened, the accounting proceeded slowly. But on or about July 16, 2001,

finding that certain financial criteria had been met, Smithfield not only relinquished its claim to the 1,000,000 shares placed in escrow (which were thereupon transferred to the defendants), but also issued to the defendants 223,436 earn-out shares. Affidavit of James I. Rim, sworn to January 30, 2004 ("Rim Aff.") at Ex. D (Schedule 13D dated August 30, 2001) at 12.[1] Thereafter, as a result of still further steps in the accounting, another 129,100 earn-out shares were issued to the defendants on July 22, 2003. *See* Rim Aff. Ex. G (Amendment 2 to Schedule 13D dated October 23, 2003) at 19.

Meanwhile, however, the defendants also sold certain of their Smithfield shares. Specifically, between September 25, 2001 and November 7, 2001—*i.e.,* fewer than six months after the July 2001 transfer of the escrow shares and issuance of the first group of earn-out shares—the defendants sold 1,960,150 shares of Smithfield stock at a substantial profit. Thereafter, between March 14, 2003 and June 6, 2003—*i.e.,* fewer than six months prior to receiving the July 2003 earn-out shares—the defendants sold 129,100 shares of Smithfield stock, again at a substantial profit.[2] Plaintiff claims that the profits from the sales of at least 1,352,536 of these 2,089,250 shares—*i.e.,* the total corresponding to the shares transferred in July 2001, and July 2003 respectively—should be disgorged as violating section 16(b)'s prohibition on "short-swing" profits. Specifically, section 16(b) requires "disgorgement to the company of any profit derived from the match-ing of any purchase and any sale of an 'equity security' ... within a six-month period by a statutory insider,[3] irrespective of intent." *See Gwozdzinsky v. Zell/Chilmark Fund L.P.,* 156 F.3d 305, 308 (2d Cir.1998).

■ However, if all the shares transferred to the defendants pursuant to the Acquisition Agreement are deemed "purchased" as of the date of that Agreement, *i.e.,* January 28, 2000, defendants are free of any liability under section 16(b), as no sales occurred within six months of that date. To be sure, while the escrow shares were issued to defendants on or about January 28, 2000, they were subject to escrow restrictions until July 2001; and the earn-out shares were not even issued until July 2001 and July 2003. Section 16(b), however, speaks not in terms of issuance or transfer but rather in terms of the terms of purchase. And there is no question that when defendants sold their companies on January 28, 2000, they did so pursuant to an agreement that said they would receive the purchase price in Smithfield stock valued as of that date, the precise quantity of which would be determined by a formalized accounting. It thus seems plain that the actual purchase of the stock occurred on January 28, 2000.

■ Such an interpretation is also consonant with the purpose of Section 16(b), which is to discourage the speculative use of inside information by corporate insiders.[4] *See, e.g., Feder v. Frost,* 220 F.3d 29,

---

1. Although on September 17, 2001, Smithfield declared a 2 for 1 stock split, *see* Ezzell Aff. ¶ 9, the Court here employs the pre-split numbers for convenience.

2. Apparently through inadvertence, the dates and amounts of these sales are specified, not in the parties' 56.1 statements, but in their briefs. *See* Mem. of Law in Supp. of Defs.'

Mot. for Summ. J., at 7; Pl.'s Mem. of Law in Opp. to Defs.' Mot. for Summ. J. at 6.

3. For purposes of this motion, it is assumed that the defendants are corporate insiders.

4. This is apparent from the face of the statute, which reads: *"For the purpose of preventing the unfair use of information which may have*

32 (2d Cir.2000); *Magma Power Co. v. Dow Chem. Co.,* 136 F.3d 316, 320 (2d Cir.1998); *Provident Securities Co. v. Foremost–McKesson, Inc.,* 506 F.2d 601, 604 (9th Cir.1974). On January 28, 2000, the defendants incurred an "irrevocable liability to take and pay for the stock," *see Blau v. Ogsbury,* 210 F.2d 426, 427 (2d Cir.1954), and no longer had "control over the transaction in any way that could be turned to speculative advantage." *Prager v. Sylvestri,* 449 F.Supp. 425, 432–33 (S.D.N.Y.1978). While the ultimate number of shares to be transferred was not then known, that number was dictated by financial formulae and criteria set forth in the Acquisition Agreement and, as plaintiff concedes, could not be modified by the defendants.[5]

Moreover, the Acquisition Agreement makes clear that the parties viewed January 28, 2000 as the effective date for the entire transaction, not solely for those shares actually then transferred to the defendants: "all of the transactions contemplated by [the Acquisition] Agreement shall be deemed for all purposes, including (i) tax purposes and (ii) the transfer of the benefits and burdens of ownership, including income and loss, to have occurred on the Effective Date." Acquisition Agreement at § 2.3.

Accordingly, defendants' motion for summary judgment is hereby granted and the complaint dismissed. Clerk to enter judgment.

SO ORDERED.

---

been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the

security purchased or of not repurchasing the security sold for a period exceeding six months." (emphasis supplied).

**5.** While the plaintiff argues that the defendants retained power under the Acquisition Agreement to influence the time at which they might receive any additional shares, the plaintiff, on this summary judgment motion, has failed to adduce any evidence to support an inference that the defendants could manipulate the timing of their receipt to reap any speculative advantage.