443 F.3d 224
 Stephen J. DiLORENZO, Plaintiff-Appellant,
v.
Wendell H. MURPHY, Harry D. Murphy, Joyce Murphy Minchew, Wendell H. Murphy Jr., Wendy Murphy Crumpler, Stratton K. Murphy, Marc D. Murphy, Angela Norman Brown, and Smithfield Foods, Inc., Defendants-Appellees.
Docket No. 04-5052-cv.
 United States Court of Appeals, Second Circuit.
 Argued: May 24, 2005.
 Decided: March 28, 2006.
 
 Paul D. Wexler, New York, New York (Bragar Wexler Eagel & Morgenstern, New York, New York; Ostrager Chong Flaherty & Broitman, New York, New York, on the brief), for Plaintiff-Appellant.
 Dennis H. Tracey, III, New York, New York (Hogan & Hartson, New York, New York, on the brief), for the individual Defendants-Appellees.
 Marshall Beil, New York, New York (McGuireWoods, New York, New York, on the brief), for Defendant-Appellee Smithfield Foods, Inc.
 Before: KEARSE, CALABRESI, and POOLER, Circuit Judges.
 KEARSE, Circuit Judge.
 
 
 1
 Plaintiff Stephen J. DiLorenzo appeals from a final judgment of the United States District Court for the Southern District of New York, Jed S. Rakoff, Judge, dismissing his derivative action brought on behalf of nominal defendant Smithfield Foods, Inc. ("Smithfield" or the "Company"), pursuant to § 16(b) of the Securities Exchange Act of 1934 ("Exchange Act" or "Act"), 15 U.S.C. § 78p(b), to recover alleged "short-swing" profits from defendants Wendell H. Murphy and the other individual defendants (collectively "defendants"). DiLorenzo contended that defendants were corporate "insiders" within the meaning of § 16(b) who (a) purchased shares of Smithfield in July 2001 that they sold less than six months thereafter, and (b) purchased additional shares of the Company in July 2003, less than six months after they had sold Company shares. The district court granted defendants' motion for summary judgment dismissing the complaint on the ground that defendants, having received their Smithfield shares as consideration for selling certain of their businesses to Smithfield on January 28, 2000, had "purchased" those shares within the meaning of § 16(b) on the date on which they sold their businesses, rather than on the later dates asserted by DiLorenzo. On appeal, DiLorenzo contends principally that the district court erred in its ruling as to the date of defendants' purchase of the Smithfield shares. For the reasons that follow, we reject his contentions and affirm the judgment of the district court.
 
 I. BACKGROUND
 
 2
 The facts set forth in the district court's June 22, 2004 opinion granting summary judgment, reported at 322 F.Supp.2d 479, which viewed the facts in the light most favorable to DiLorenzo as the party against whom summary judgment was granted, are as follows.
 
 A. The Transactions and the Present Action
 
 3
 Prior to January 28, 2000, defendants owned certain businesses ("Murphy Farms") that they agreed to sell to Smithfield pursuant to an Acquisition Agreement and Plan of Reorganization ("Acquisition Agreement" or "Agreement"), in exchange for which they would receive shares of Smithfield common stock. That transaction closed on January 28, 2000. The Acquisition Agreement provided that the number of Smithfield shares to be received by defendants would bear a fixed relation to the financial condition of the Murphy Farms businesses, which would be determined by an accounting to be made in accordance with financial criteria that were specified in the Agreement. The district court noted that the total purchase price for Murphy Farms would be determined by that accounting, and defendants would be paid that price in shares of Smithfield common stock based on the January 28, 2000 closing price of that stock. (See Acquisition Agreement § 2.4.)
 
 
 4
 Pursuant to the Agreement, on January 28, 2000, defendants transferred their interests in Murphy Farms to Smithfield and received 10,054,396 shares of Smithfield common stock; and an additional 1,000,000 shares were issued to them but were placed in escrow. Depending on the results of the accounting, defendants thereafter (a) would receive some or all of the 1,000,000 shares held in escrow, or (b) would receive the 1,000,000 escrowed shares plus additional shares ("earn-out" shares), or (c) would receive none of the escrowed shares and would be required to return some of the 10,054,396 shares they had received on January 28, 2000 ("claw-back" shares). (See id. § 2.4(d).)
 
 
 5
 In July 2001, following completion of the initial stages of the accounting, Smithfield "not only relinquished its claim to the 1,000,000 shares placed in escrow (which were thereupon transferred to the defendants), but also issued to the defendants 223,436 earn-out shares." 322 F.Supp.2d at 481. "[B]etween September 25, 2001 and November 7, 2001 — i.e., fewer than six months after the July 2001 transfer of the escrow shares and issuance of the first group of earn-out shares — the defendants sold 1,960,150 shares of Smithfield stock at a substantial profit." Id. Between March 14, 2003, and June 6, 2003, defendants sold an additional 129,100 shares of Smithfield stock. "Thereafter, as a result of still further steps in the accounting, another 129,100 earn-out shares were issued to the defendants on July 22, 2003," id., that is, less than six months after defendants' second sale.
 
 
 6
 DiLorenzo, a Smithfield shareholder, brought the present derivative action alleging that defendants' relevant "purchases" of Smithfield stock for purposes of § 16(b) occurred (1) upon the release of the escrow shares and the Company's agreement to issue 223,436 earn-out shares in July 2001, and (2) upon the Company's agreement to issue another 129,100 earn-out shares in July 2003. (See, e.g., Complaint ¶¶ 15, 28, 29.) With those events viewed as "purchases," DiLorenzo contended that defendants' sales of Smithfield stock resulted in "short-swing" profits within the meaning of § 16(b), totaling at least $32,071,591 that DiLorenzo argued should be disgorged to Smithfield.
 
 
 7
 The individual defendants moved to dismiss the complaint for failure to state a claim on which relief can be granted or, in the alternative, for summary judgment. Smithfield, after reviewing DiLorenzo's complaint, joined defendants' motion to dismiss for failure to state a claim.
 
 B. The Decision of the District Court
 
 8
 The district court granted defendants' motion for summary judgment. Noting that "section 16(b) requires `disgorgement to the company of any profit derived from the matching of any purchase and any sale of an "equity security" . . . within a six-month period by a statutory insider, irrespective of intent,'" 322 F.Supp.2d at 481 (quoting Gwozdzinsky v. Zell/Chilmark Fund, L.P., 156 F.3d 305, 308 (2d Cir. 1998)) (footnote omitted), the court assumed for purposes of the motion "that the [Murphy] defendants [we]re corporate insiders" within the meaning of that section, 322 F.Supp.2d at 481 n. 3. However, the court held that "the actual purchase of the [Smithfield] stock" by defendants "occurred on January 28, 2000," and thus that defendants are "free of any liability under section 16(b), as no sales occurred within six months of that date." Id. at 481.
 
 
 9
 The district court reasoned that although 1,000,000 shares were "subject to escrow restrictions until July 2001[,] and the earn-out shares were not even issued until July 2001 and July 2003," id., § 16(b)
 
 
 10
 speaks not in terms of issuance or transfer but rather in terms of the terms of purchase. And there is no question that when defendants sold their companies on January 28, 2000, they did so pursuant to an agreement that said they would receive the purchase price in Smithfield stock valued as of that date, the precise quantity of which would be determined by a formalized accounting. It thus seems plain that the actual purchase of the stock occurred on January 28, 2000.
 
 
 11
 Such an interpretation is also consonant with the purpose of Section 16(b), which is to discourage the speculative use of inside information by corporate insiders.... On January 28, 2000, the defendants incurred an "irrevocable liability to take and pay for the stock," see Blau v. Ogsbury, 210 F.2d 426, 427 (2d Cir.1954), and no longer had control over the transaction in any way that could be turned to speculative advantage.... While the ultimate number of shares to be transferred was not then known, that number was dictated by financial formulae and criteria set forth in the Acquisition Agreement and, as plaintiff concedes, could not be modified by the defendants.
 
 
 12
 322 F.Supp.2d at 481-82 (other internal quotation marks omitted).
 
 
 13
 DiLorenzo also contended that § 16(b) should be applicable on the theory that the individual defendants had "retained power under the Acquisition Agreement to influence the time at which they might receive any additional shares." Id. at 482 n. 5. The district court rejected that contention because DiLorenzo "failed to adduce any evidence to support an inference that the defendants could manipulate the timing of their receipt to reap any speculative advantage." Id.
 
 
 14
 Judgment was entered dismissing the complaint, and this appeal followed.
 
 II. DISCUSSION
 
 15
 On appeal, DiLorenzo contends that the district court erred in granting summary judgment in favor of defendants, arguing principally that an insider "purchases" stock for purposes of § 16(b) only when his obligation to pay for stock concerns a fixed number of shares. We disagree.
 
 
 16
 Section 16 of the Exchange Act addresses "short-swing" transactions by statutory insiders, a term defined to include any person who is the beneficial owner of more than 10 percent of any class of the issuer's non-exempt, registered equity securities, see 15 U.S.C. § 78p(a); see also id. § 78m(d)(3) (under certain circumstances, groups of persons acting in concert are treated as single entities for the purposes of § 16(b)).
 
 
 17
 Section 16(b) provides, in pertinent part, as follows:
 
 
 18
 For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner ... by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) ... within any period of less than six months, ... shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner ... in entering into such transaction of holding the security... purchased or of not repurchasing the security ... sold for a period exceeding six months.
 
 
 19
 15 U.S.C. § 78p(b) (emphases added). This provision "requires the inside, short-swing trader to disgorge all profits realized on all `purchases' and `sales' within [a six-month] period, without proof of actual abuse of insider information, and without proof of intent to profit on the basis of such information." Kern County Land Co. v. Occidental Petroleum Corp., 411 U.S. 582, 595, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973).
 
 
 20
 The Act defines "`purchase'" to "include any contract to buy, purchase, or otherwise acquire." 15 U.S.C. § 78c(a)(13) (emphasis added). Where it is unclear whether the formation of a contract constituted a purchase within the contemplation of § 16(b), "[t]he judicial tendency, especially in this circuit, has been to interpret Section 16(b) in ways that are most consistent with [its] legislative purpose." Steel Partners II, L.P. v. Bell Industries, Inc., 315 F.3d 120, 124 (2d Cir.2002) (internal quotation marks omitted). As § 16(b) states that its purpose is to prevent unfair use of information that may have been obtained by a beneficial owner by reason of his relationship to the issuer, courts "interpreting the terms `purchase' and `sale,' . . . have properly asked whether the particular type of transaction involved is one that gives rise to speculative abuse," Kern County Land Co., 411 U.S. at 595, 93 S.Ct. 1736 (quoting Reliance Electric Co. v. Emerson Electric Co., 404 U.S. 418, 424 n. 4, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972)) (other internal quotation marks omitted); see Blau v. Ogsbury, 210 F.2d 426, 427 (2d Cir.1954) ("[S]peculation, actual or potential, is the only vice within the purview of § 16(b)."). See also Booth v. Varian Assoc., 334 F.2d 1, 4 (1st Cir.1964) (where, under a 1959 agreement (a) the number of shares purchased by the insider from the company was not to be determined until a closing date in mid-1962, i.e., some 3½ years later, (b) the closing date was subject to acceleration by the company and in certain circumstances by the insider, and (c) "the purchase price [was left] unfixed" and was to be "fixed at the closing market quotation on the day prior to the closing,... thus making the purchase under the contract as much as possible like a market purchase at the time of the closing," the purchase was deemed made on the closing date in 1962, not on the agreement date in 1959 (emphasis in original)); Prager v. Sylvestri, 449 F.Supp. 425, 433 (S.D.N.Y. 1978) (where the defendant sold his business to the company in 1972 in consideration for (a) shares of the company on the effective date of the merger plus (b) additional earn-out shares based on the performance of that business during the ensuing four-year period, his purchase was made, for § 16(b) purposes, on the effective date of the merger rather than the later dates of issuance of the earn-out shares because, "[]on the effective date of the merger, the defendant's commitment to purchase became irrevocable (indeed, the purchase was executed) and the size of his investment was fixed" (emphasis in original)).
 
 
 21
 Blau v. Ogsbury, 210 F.2d 426, involved an option granted by a company to its chief executive officer, Ogsbury, to buy 10,000 shares of the company's stock at $4.50 per share. As amended, the compensation agreement allowed Ogsbury to exercise the option and to postpone payment for the covered shares; until payment was made, title to the shares was to remain with the company. Ogsbury exercised his option in 1945 but postponed payment for some three years. Less than six months before he eventually made payment and received title to those shares, he sold 600 shares of the same class of security at a price higher than the option price. This Court affirmed summary judgment dismissing a § 16(b) derivative action brought to recover the difference as short-swing profits, reasoning that "the `purchase' was consummated in 1945 when Ogsbury mailed his notice of election and thereby incurred an irrevocable liability to take and pay for the stock. Thereafter for all speculative purposes he owned the stock." Id. at 427. The fact that payment and delivery were to be delayed did not "justify finding two `purchases' where in fact but one exists." Id. We concluded that
 
 
 22
 [s]ince the only "purchase" before us took place in 1945, and no sale ensued until 1948, there has been no short-swing transaction within the statutory prohibition. Hence whatever the profits, they are not recoverable for the corporation under this statute.
 
 
 23
 
 Id.
 
 
 
 24
 In the present case there was similarly but one purchase by defendants of Smithfield shares. The Acquisition Agreement was plainly a "contract" entered into by defendants "to ... acquire" shares of Smithfield stock within the meaning of the Exchange Act. The consideration for their purchase of the Smithfield shares — i.e., the price defendants paid — was their proprietary interests in Murphy Farms. Their obligation to pay for the shares was fixed at the closing on January 28, 2000; indeed, defendants fulfilled their entire obligation on that date when their interests in Murphy Farms were transferred to Smithfield.
 
 
 25
 DiLorenzo contends that defendants did not at that time purchase all of the Smithfield stock to which they were entitled because the total number of those shares was uncertain, arguing that Blau held that an insider has purchased stock for § 16(b) purposes only when his contract concerns "a definite quantity of stock" (DiLorenzo brief on appeal at 18). We disagree with DiLorenzo's characterization of Blau's holding and its effect. Blau did concern an option to buy a precise number of shares, and the Blau Court made reference to "a fixed quantity" of stock in describing the "needs" of a "speculator," 210 F.2d at 427. But the decision turned on the fact that in exercising his option, Ogsbury incurred an irrevocable obligation to pay a precise sum for the shares. See id. Here, too, defendants, in entering into the Acquisition Agreement, incurred an irrevocable obligation to acquire Smithfield shares for precise consideration. While defendants did not know on the closing date precisely how many shares of Smithfield stock they would ultimately receive in exchange for the price they paid, their obligation was fixed. Further, under the terms of the Acquisition Agreement, any consideration to which defendants were entitled in addition to the shares actually transferred to them on January 28, 2000, depended on the precise financial condition of Murphy Farms as of January 28, 2000; that condition was to be determined by neutral accountants; the accountants were to apply fixed criteria stated in the Acquisition Agreement; and any additional consideration to defendants would be in the form of Smithfield shares valued at the closing price of that stock on January 28, 2000. DiLorenzo has not called to our attention any provision in the Acquisition Agreement that might have allowed defendants to retrieve all or part of their interests in Murphy Farms, or otherwise to alter the criteria for determining the number of shares to which they were or are ultimately entitled under the Agreement.
 
 
 26
 Accordingly, we reject DiLorenzo's contention that defendants' purchase of the escrowed shares or the earn-out shares occurred on the dates of transfer of the escrowed or earn-out shares, rather than on January 28, 2000, the date on which defendants fully and irrevocably paid for those shares by transferring their interests in Murphy Farms to Smithfield. Defendants having paid in full on January 28, 2000, for whatever shares they were entitled to, their later receipt of shares as consideration for their January 28, 2000 transfer of Murphy Farms did not constitute new purchases. As the date of purchase of all shares to which defendants are entitled as a result of the Acquisition Agreement is January 28, 2000, and there is no allegation of any sales by defendants of Smithfield stock within six months before or after that date, the district court correctly ruled that there was no short-swing transaction within the meaning of § 16(b).
 
 
 27
 We also reject DiLorenzo's additional contention that summary judgment against him was inappropriate because there is a genuine issue to be tried as to whether defendants had control over the transaction in a way that could be turned to their speculative advantage. (See DiLorenzo brief on appeal at 21.) The district court rejected this contention on the ground that DiLorenzo had failed to present any evidence to support it. On this appeal, DiLorenzo has not demonstrated any error in that ruling.
 
 CONCLUSION
 
 28
 We have considered all of DiLorenzo's arguments and found them to be without merit. The judgment of the district court is affirmed.